## LEAR v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. July 16, 1906.)

### No. 42.

**1. CRIMINAL LAW—VERDICT—CONSTRUCTION.**

In a prosecution for violating the national bank act (Act June 3, 1864, c. 106, 13 Stat. 101 [U. S. Comp. St. 1901, p. 3486]) the indictment contained 150 counts covering 50 transactions with reference to each of which embezzlement, abstraction, and willful misapplication were severally charged. The court directed an acquittal as to the charges

of embezzlement and charged that the first three counts involving a
$10,000 note transaction might be first considered. and. if that money
was abstracted or willfully misapplied, the jury should convict de-
fendant, and need not go further into the case. The jury on returning
announced that they had found defendant guilty as indicted in the
third count; but the verdict, as recorded, was that the defendant was
guilty in manner and form as charged in the third count in the indict-
ment, and not guilty as to the remaining counts. *Held*, that such ver-
dict was not tantamount to an express finding that the facts requisite
to a conviction on any of the other counts had not been shown to exist,
and that there was therefore no evidence on which a finding of their
existence with reference to the third count could be sustained.

2. BANKS AND BANKING—NATIONAL BANKS—ABSTRACTION AND MISAPPLICA-
TION OF FUNDS.
    In a prosecution of the president of a national bank for violating
the national bank act (Act June 3. 1864. c. 106, 13 Stat. 101 [U. S.
Comp. St. 1901, p. 3486]), evidence *held* sufficient to require submission
to the jury of the question whether he willfully abstracted and mis-
applied to his own use funds of the bank to the extent of $10,000, with-
out the authority of the bank's board of directors.

In Error to the District Court of the United States for the Eastern
District of Pennsylvania.

George S. Graham, for plaintiff in error.
Henry P. Brown, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD,
District Judge.

GRAY, Circuit Judge. The plaintiff in error, who, during the
period involved, was president of the Doylestown National Bank,
was tried in the District Court for the Eastern District of Pennsyl-
vania, upon an indictment framed under section 5209 of the Revised
Statutes [U. S. Comp. St. 1901, p. 3497], which is as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of
any association, who embezzles, abstracts, or willfully misapplies any of the
moneys, funds, or credits of the association; or who, without authority
from the directors, issues or puts in circulation any of the notes of the
association; or who, without such authority, issues or puts forth any cer-
tificate of deposit, draws any order or bill of exchange, makes any accept-
ance, assigns any note, bond, draft, bill of exchange, mortgage, judgment
or decree; or who makes any false entry in any book, report or statement
of the association, with intent, in either case, to injure or defraud the asso-
ciation or any other company, body politic or corporate, or any individual
person, or to deceive any officer of the association, or any agent appointed
to examine the affairs of any such association; and every person who with
like intent aids or abets any officer, clerk, or agent in any violation of this
section, shall be deemed guilty of a misdemeanor, and shall be imprisoned
not less than five years nor more than ten."

The indictment covered fifty transactions, and, with respect to each
of them, embezzlement, abstraction and willful misapplication were
severally charged. Accordingly, there were one hundred and fifty
counts. The court directed the jury to acquit of embezzlement, and
fifty of the counts were eliminated. The charges of abstraction and of
willful misapplication were submitted, with instructions, no part of
which has been assigned for error, and which, in our opinion, were not

open to valid exception. But the learned counsel of the defendant requested the learned judge to charge that, "under all the evidence in this case as now presented by the prosecution, your verdict should be for the defendant"; and the refusal of this request, the fifth specification avers was erroneous. There are four other specifications, but none of them has been pressed in argument. The first three are plainly without merit, and the fourth relates to counts upon which there was no conviction, and therefore is immaterial.

The defendant's claim of right to binding instructions went to the the whole case, and was based upon "all the evidence." His proposition was, that upon the evidence as a whole, the entire case should be withdrawn from the jury; and that, at the time the court below was required to pass upon it, this proposition could not have been properly affirmed, is indubitable. It has been suggested, however, that the ruling of the court below should now be regarded, not as of the time at which it was made, but with reference to the verdict that was subsequently rendered, and which, it is supposed, has had the effect of excluding some of the evidence from present consideration. This suggestion will be first disposed of.

At the close of his charge, the learned judge, addressing the jury, said:

"I want to say this with reference to this indictment. You need not trouble yourself reading this over, or any part of it. The first three counts of this indictment are concerned with the $10,000 note, which was obtained in July, 1901. You will perhaps find it desirable, or convenient, to take that subject up first, and if you are satisfied, beyond a reasonable doubt, that that money was abstracted, or willfully misapplied, guided by the instructions I have given you, then there is no occasion for you to go any further into the case, because that disposes of it finally, but if you find in favor of the defendant with regard to that matter, then you will be obliged to go into this series of overdrafts, and you will have to determine concerning those, whether, with regard to any one or more of them, the offense of abstraction or willful misapplication has been committed. As I have said, it is possible for the jury to find in favor of the defendant as to some portion, and in favor of the Government as to others, or they may find in favor of the defendant as to all or in favor of the Government as to all."

Some further remarks were made in explanation of the general charge, and "the jury then retired, and on their return to the court, announced that they had found the defendant guilty as indicted in the third count"; but the verdict, as recorded, was "that the defendant, Henry Lear, is guilty in manner and form as he stands charged in the third count of the indictment, and not guilty as to the remaining counts"; and the contention appears to be, that this verdict was tantamount to an express finding that the facts requisite to a conviction upon any of the counts other than the third had not been shown to exist, and that therefore it must now be assumed that there was no evidence upon which a finding of their existence, with reference to the third count, could be sustained. We cannot accede to this contention. We would not be disposed to reject it merely because the point to which it is directed is not presented by the assignment of errors; but a conclusive answer to it is, that we are not at liberty to

indulge in conjecture respecting the grounds of a verdict, or to add to its terms by inference.

The inference we are asked to draw in this instance, is precluded, we think, by the circumstances which preceded and attended the rendition of the verdict; but if this were not so, it could not legitimately affect our decision of the question before us. If there was no evidence to sustain the conviction upon the third count, it of course should not be permitted to stand; but if there was, it is not within the province of this court to inquire, or by deduction to surmise, how the whole or any part of that evidence was dealt with by the jury.

The count as to which there was a verdict of guilty, is as follows:

"Count 3. And the grand inquest aforesaid, inquiring as aforesaid, upon their respective oaths and affirmations as aforesaid, do further present, that heretofore, to wit, upon the sixteenth day of July, in the year of our Lord one thousand nine hundred and one, the said Henry Lear, late of the district aforesaid, at the district aforesaid, and within the jurisdiction of this court, to wit: at the borough of Doylestown, in the county of Bucks, and state of Pennsylvania, being then and there president of a certain national banking association, a body corporate, then and there known and designated as the Doylestown National Bank, in the borough of Doylestown, in the county of Bucks and state of Pennsylvania, which said national banking association had been theretofore created, organized and established under and by virtue of the acts of Congress in such case made and provided, and was then existing and doing a banking business at the borough of Doylestown, state of Pennsylvania, in the district aforesaid, did then and there unlawfully, knowingly, and fraudulently, and with intent in him, the said Henry Lear, to injure and defraud the said banking association, and without the knowledge and consent of the said banking association, its board of directors and committees, willfully misapply certain of the moneys, funds and credits of the said banking association, for the use, benefit and advantage of him, the said Henry Lear, and for the use, benefit and advantage of a person and persons other than the said banking association, the name and names of the said person and persons being to the grand inquest unknown, to wit: the sum of, and of the value of ten thousand dollars, then and there belonging to and being the property of the said banking association, in the manner and by the means following, that is to say, that he, the said Henry Lear, being then and there president as aforesaid, and by virtue of the official relation of the said Henry Lear, as president of the said banking association, and by virtue of the power of control, direction and management which the said Henry Lear possessed over the moneys, funds and credits of the said banking association, did then and there, pay and cause to be paid to the said Henry Lear, and to a person and persons to the grand inquest unknown, upon and pursuant to the direction and authorization contained in a certain draft of the said banking association drawn upon the First National Bank of Philadelphia to the order of the said Henry Lear, and signed by George P. Brock, cashier of the said Doylestown National Bank, the said banking association, from and out of the moneys, funds and credits then and there belonging to, and being the property of the said banking association, and without the knowledge and consent of the said banking association, its board of directors, and committees, the sum of and of the value of ten thousand dollars, a more particular description of the said moneys, funds and credits so paid and caused to be paid being to the grand inquest unknown; which said draft was then and there in printing and writing dated the sixteenth day of July, A. D. 1901, authorizing and directing the said First National Bank of Philadelphia to pay to the order of the said Henry Lear the sum of ten thousand dollars of the moneys, funds, and credits of the Doylestown National Bank, the banking association aforesaid. Which said sum, so paid and caused to be

paid as aforesaid, was then and there in excess of all amounts which the said Henry Lear was then and there lawfully entitled to draw and have paid out of the moneys, funds and credits of the said banking association; that on said date, when said draft was paid and caused to be paid as aforesaid, the said Henry Lear, then and there had no moneys, funds and credits with the said banking association; that there was not then and there due and owing to the said Henry Lear from the said banking association any moneys, funds and credits whatever, that the repayment of the said sum to the said banking association was not then and there in any way or manner secured; all of which he, the said Henry Lear, then and there well knew, and that the said sum was then and there willfully, wrongfully and unlawfully appropriated and converted to the use, benefit and advantage of the said Henry Lear, and to the use, benefit and advantage of a person and persons other than the said banking association, the name and names of the said person and persons being to the grand inquest unknown, and was thereby wholly lost to the said banking association; with intent in him, the said Henry Lear, to injure and defraud the said banking association; contrary to the form of the act of Congress in such case made and provided, and against the peace and dignity of the United States of America."

That upon July 16th, 1901, the defendant, being then the president of the Doylestown National Bank, did obtain the draft for $10,000 described in this count, and did apply the proceeds thereof to his own use is not denied. But it is insisted that there was no sufficient proof that it was obtained without the knowledge and consent of the board of directors of the bank, and by virtue of the defendant's official relation, and power of control, direction and management over its moneys, funds and credits, or that in obtaining it he intended to injure and defraud the bank. Whether the board of directors had knowledge of the transaction, was a question of fact which the jury must be presumed to have negatively decided; and that there was evidence to warrant that decision, the record does not permit us to doubt. It is argued, however, that the transaction was one of loan, made by the cashier in the bona fide exercise of his authority to lend the moneys of the bank in the intervals between the meetings of the board of directors, and therefore the action of the cashier was the action of the board and constituted a business transaction between the plaintiff in error and the bank, which, whether wise or unwise, it was within the lawful competence of the parties to effect. It is true that there was testimony tending to show that the cashier was clothed with such authority, and made such loans and discounts as are ordinarily made by a bank in the course of its business, in the intervals between the sessions of its board, and that the loans thus made were reported at its next meeting for confirmation. There was also testimony tending to show that this transaction with the president of the bank, by which he received $10,000 of the bank's money, upon his unsecured demand note, was included in the aggregate of loans reported by the cashier to the board of directors. It was not in evidence, however, that the members of the board understood the transaction, or had their attention specifically called to it, either by the cashier or by the defendant, who was president of the board. That loans made by the cashier in the regular course of business, and in the customary way, by virtue of the authority thus reposed in him, may be, and generally are, lawful transactions between the bank and those thus obtaining the loan of its funds,

147 F.—23

is not to be denied. But their lawfulness depends upon the bona fides with which they are made. If the defendant had applied to the board of directors, of which he was a member, for a loan of $10,000, upon his demand note, without security, making a full and true statement of his indebtedness to the bank, the purpose of the loan and the prospect of repaying it, it is conceivable that such loan might have been made, and lawfully made. The board of directors, acting within the scope of its authority for the time being, was the bank itself, and without other evidence of fraud or imposition, the transaction would be a lawful one, without regard to its wisdom or unwisdom. In such case, the opportunity for fraud and imposition would have been small, and. the authority of the board of directors plenary. It is manifest that the authority delegated to the cashier by. the board, for making loans and discounts in the interval between the sessions of the board, was one restricted by its nature and purpose, and that its exercise outside of the ordinary and routine business of the bank, was not contemplated. Such an exercise of authority would more easily lend itself to the accomplishment of fraud, than would action by the board of directors.

From the evidence disclosed in the record, it appears that one Brock, cashier of the Doylestown National Bank, on July 16th, 1901, permitted the defendant to obtain the draft of the bank for $10,000 upon the First National Bank of Philadelphia, payable to his, the defendant's, order; that he caused this draft to be given the defendant upon his demand note for that sum, without security; that at the time the draft was so given, defendant, to the knowledge of the cashier, was indebted to the bank in the sum of $29,098.89, of which $12,924.83 was overdraft; that the capital of the bank was $105,000. and that the defendant was its president. There is no evidence to show that the cashier reported to the board of directors that defendant had obtained this money upon his unsecured note, or otherwise, or that the president, who was a member of the board, ever so informed them. Brock had been cashier less than a year, and under all the circumstances, it would not be an unfair inference that the cashier yielded to the dominating influence and control which naturally attached to the office of president, who, as such, was his superior officer, and, in the language of the indictment, "by virtue of the power, control, direction and management which the said Henry Lear possessed over the moneys, funds and credits of the said banking association, did, then and there, pay and cause to be paid to the said Henry Lear * * * from and out of the moneys, funds and credits of the said banking association, and without the knowledge and consent of the said banking association, its board of directors and committees, the sum and value of $10,000."

We cannot say that the jury, in consideration of all the facts and circumstances of the case, were not justified in finding that this was not such a transaction as came within the ordinary scope of the authority delegated to the cashier, nor a bona fide loan of the funds of the bank to the defendant, but on the contrary, was a misapplication made by the defendant of the funds in the bank, for his own use,

effected by means of his authority and control, as president, over the affairs of the bank and its subordinate officers. It was not an ordinary loan, effected in the usual way in which such loans are made to ordinary customers of the banking association. It was a handing over of $10,000 of the bank's funds, without security, by the cashier, on the demand of his superior officer, whom he knew at that time to be indebted to the bank in a sum exceeding $29,000, part of which were overdrafts, of which there is testimony tending to show that the directors were not cognizant. Nor could it have escaped the notice of the cashier, that the natural course of the president of the bank, if he honestly desired to obtain such a loan, would have been to have obtained the same directly through the action of the board of directors, of which he, the president, was a member and presiding officer. Yet it is not denied that the cashier made no report to the board of directors, calling their attention to the so-called loan and the peculiar circumstances attending it, or that the defendant, as president of the board, or otherwise, never informed them of what had been done. That it was regularly entered in the books of the bank as a loan, did not necessarily mean notice to the directors; and there is the testimony of these officers themselves, that they had no notice in this way or otherwise.

It is hard to conceive why no report and no explanation was made by the cashier to the board of directors, of this extraordinary transaction, and the jury may well have been unable, when taken in connection with other circumstances surrounding it, to reconcile the cashier's silence with good faith on his part. Touching upon the reasons which may have influenced the defendant in the first place, in obtaining this sum in the way described, without the express consent of the board of directors, and afterwards in refraining from informing them of the fact, there was in evidence before the jury a correspondence between the comptroller of the currency and the board of directors of the bank. On May 15th, 1901, the comptroller had written to the defendant, as president of the bank, calling his attention to the fact that his indebtedness to the bank was excessive and should be reduced within the limits prescribed by law. That the aggregate of that indebtedness was $26,381.21, including an overdraft of $11,481.21 of long standing, and a note of $4,000 past due since January 15th, 1900. To this letter the defendant and the board of directors replied, under date of May 22d, 1901, that since the report referred to by the comptroller, the loan to Henry Lear had been reduced to the extent of $5,000 during the week in which the letter was written; that the overdraft chargeable to him had been cleaned up and secured, and that the past due note of $4,000 had been taken up and interest paid thereon. This letter was signed by Henry Lear and all the directors, save one. Yet, on July 16th, when the $10,000 draft was obtained from the cashier on his demand note, his indebtedness to the bank amounted to $29,098.89, and Edward P. Moxey, an expert accountant and bank examiner, called as a witness by the government, testified as follows:

"Q. I show you copy of letter of May 22, 1901, from Henry Lear and the other directors of the Doylestown National Bank, to the Comptroller of the Currency, and call your attention to the statement in that letter: 'The loan to Henry Lear has been reduced to the extent of $5,000 during the present week, and will be rapidly reduced hereafter. The overdraft chargeable to him has been cleaned up, and is secured. The past due note of $4,000 has been taken up and interest paid thereon.' From an examination of the books of the bank, are you able to state whether or not the overdraft chargeable to Mr. Lear's account on that date had been cleaned up and secured?

".A. It had not.

"Q. What was his overdraft at that time, May 22? 1901?

"A. His overdraft at that time was: His personal account, $3,963.28, and his attorney account, $7,820.48; a total of $11,783.76.

"Q. How long did that overdraft continue to that account?

"A. That overdraft continued until February 10, 1902, when it had gradually increased until it amounted to $17,157.27, and on that day the overdrafts in both accounts, H. Lear and H. Lear, attorney, was entered paid. That is the date that the demand loan of $20,000 went in the bank.

"Q. It is stated in this letter also that 'past due note of $4,000 has been taken up and interest paid thereon.' Do you find any entry at or about that date showing this past due note of $4,000 had been taken up?

"A. On that date a note of $4,000 and No. 310 was entered paid, and on that date a new note, No. 229, due August 1, 1901, for $4,000, went in the bank.

"Q. It states here, 'The loan to Henry Lear has been reduced to the extent of $5,000 during the present week'; that is, the week ending May 22, 1901. Do you find by the books there had been a payment of $5,000 during that week, as stated by this letter?

"A. No, sir."

From what has been already said, we think it will be apparent that the evidence, tending to show that the money obtained upon this demand note of July 16th, 1901, was obtained without the knowledge of the board of directors, and with the connivance of the cashier, tends also to show that it was obtained by the defendant willfully and with intention to defraud the bank and convert the same to his own use. It is not sufficient to suggest that in this, as in most cases of the kind, there was a floating intention to repay the money thus obtained. It is probable that this is true. But the jury were warranted upon the evidence, in finding that the money was obtained without regard to the security of the bank, and with the intent on the part of the defendant, that the bank should, without its knowledge or consent, take the risk of his (the defendant) being able to return the money so obtained. Such a finding sufficiently supports the averment of a misapplication of the funds of the bank without its knowledge or consent, and with intent to injure or defraud the same. We cannot agree with the contention of counsel for the plaintiff in error, that an officer of a bank cannot "misapply" its funds, in the sense of the statute, unless he has direct control or custody of such funds. The defendant in this case was the head officer of the bank, and there is nothing to show that as such he did not possess the power, prestige and authority attaching to his office. All other officials were his subordinates, and the inference was a fair and natural one from the facts proved, that "by virtue of his official relation to the bank," he had "such control, direction and power of management as to direct an application of the

funds in such a manner and under such circumstances as to constitute the offense of willful misapplication." U. S. v. Northway, 120 U. S. 332, 7 Sup. Ct. 580, 30 L. Ed. 664. The word "misapply," as used in the statute, does not necessarily mean that the officer in charge should have physical possession of the funds misapplied. · It is sufficient if he have such "control. direction and power of management as to direct an application" of the same.

We have so far confined our attention to the evidence bearing solely upon this transaction of the draft of $10,000 obtained by the defendant as described in the third count of the indictment, because the gravamen of the contention made by counsel for the plaintiff in error, is that the evidence in this respect was insufficient to warrant the jury in finding the defendant guilty on the third count, and that the evidence in regard to the other alleged overdrafts and misapplications of money, extending through two years and relating to 50 separate transactions, was before the jury, but could not have been considered by them in connection with the charge in the third count, of which they found him guilty. This argument is founded upon the finding of the jury, under the circumstances related at the outset of this opinion, that the defendant was guilty on the third count, but not guilty as to all the other counts. This being so, it is argued, with much ingenuity by the learned counsel for plaintiff in error, that these other transactions, consisting of overdrafts and alleged illegal loans from the bank, upon which the other counts in the indictment were founded, and the evidence in relation thereto, could not be considered by the jury in connection with the charge contained in the third count. We have already, and as we think sufficiently, considered and answered this contention, and refer to it again only that we may reiterate our opinion, that the learned trial judge could not have properly done otherwise than refuse to charge as requested by defendant, that "under all the evidence in this case, as now presented for the prosecution, your verdict should be for the defendant." It is perfectly clear that all the evidence relating to all the counts, was properly submitted to the jury, and we cannot now inquire as to how this evidence was applied to the different counts. If, from all the evidence so submitted, the jury has found the defendant guilty of the third count alone, we cannot disturb that verdict, even though it is recorded as not guilty on all the other counts. The alleged error is as to what was done by the trial judge before the case was submitted to the jury, to wit, that he refused to give peremptory instructions in favor of the defendant. If, as we have said, it be clear that the trial judge could not properly have done otherwise, the assignment of error in relation thereto cannot be made, notwithstanding that fact, to cover an alleged error by the jury, in dealing with the evidence properly submitted to them, even if that were a permissible subject of inquiry. We have, however, taken pains to examine all the evidence bearing directly upon the charge contained in the third count, and have, as above stated, found it sufficient to warrant the verdict of the jury.

The argument for plaintiff in error has turned upon the alleged error in the refusal of the court to give binding instructions to the

jury in favor of the defendant. The exceptions to certain portions of the charge contained in the other assignments of error, have, as we have already said, not been urged, and if urged could not have been sustained. The charge as a whole was exceedingly fair to the defendant, and gave him the benefit of any favorable construction that could be placed upon his conduct.

We are compelled, therefore, to the conclusion that the judgment below should be affirmed.

ARCHBALD, District Judge (concurring). The request of the defendant for binding instructions went to the whole case, and so to every part of it. It was not necessary to specify or repeat it as to each of the hundred different counts of the indictment. It is therefore available at this time upon the question of the sufficiency of the evidence to sustain a conviction on the third count, as to which alone there was a verdict of guilty. Aside from this, and without any such request, under the authority of Twining v. United States (C. C. A.) 141 Fed. 41, and the cases there cited, we would have the right, and it would be our duty, to look into the record, and to reverse, if the proper evidence was not found there. The difficulty with the case is that the jury declared the defendant guilty on a count, as to which the evidence was the least conclusive. This is probably attributable to the somewhat questionable instruction that, if they were satisfied that there was a willful misapplication of the funds of the bank by the $10,000 loan of July, 1901, this disposed of the whole case, and they need not go into anything which occurred thereafter, and to the entry, upon the return of a conviction as to the count which covers this, of not guilty as to the rest. This did not take out of the case, however, as contended, the evidence of subsequent transactions, whatever may be the seeming inconsistency in declaring them innocent, while holding otherwise as to the original, upon which they are merely cumulative. They could still be resorted to for the purpose and intent of the defendant, as manifested by his repeated diversion of the funds of the bank for his own benefit, regardless of the risk in which it was being thus involved.

That the defendant was guilty of a serious misapplication of the funds of the bank, within the meaning of the law, when he obtained the loan in question, on his own unsecured individual note, there can be but one opinion. The only question is whether he was chargeable with the delinquency as president, and whether there was evidence of a fraudulent or willfully injurious intent. But that it was calculated to work injury is clear, and he had no right to impose upon the bank the danger of loss which it unmistakably involved. It is true that the financial credit of the defendant at the time is not shown; and, as president of the bank, it may be assumed that he was a person of some reputed means. Nor did he fail until fully two years later. But he was already heavily indebted to the bank; a material portion of the indebtedness being in the shape of overdrafts or forced loans which he had been apparently unable to take up. He was also engaged in stock speculations, the ultimate cause of his downfall, from

which the transaction cannot be detached; the $10,000 obtained being admittedly for the purpose of making good his margins, on pressing calls from his brokers. It is in the willingness to put the bank at this peril that the intent to injure or defraud appears. There did not have to be a direct mental purpose to that effect. No doubt he intended to repay. But, on the question of intent, a person is rightly held to the natural and probable results of what he does. A reckless act, moreover, is always regarded as the equivalent of a willful one, and that at least was here. The possibility of injury was apparent on the face of the transaction, notwithstanding which the interests of the institution of which he was the trusted head were put aside, and his own made paramount, in utter disregard of the outcome. This fully justified the imputation of a wrongful intent, whatever there may have been in fact.

It was necessary to show, however, that the misapplication of the funds of the bank so made was ascribable to the defendant as president, with regard to which it is confidently affirmed that there was no proof. The loan, as it is said, was obtained in the ordinary way, of the cashier, who in the interim between board meetings was intrusted with full authority to discount paper, and was subsequently submitted to the directors, by whom it was passed. This is undoubtedly a turning point in the case. The knowledge of the directors is strenuously denied, but is not vital. The defendant's position would, no doubt, be materially strengthened if this was established. He was not precluded, simply because he was president, from borrowing from the bank in the ordinary way with the approval of the governing board, and a conviction for misapplication of money obtained with such sanction, even though there was nothing but his own obligation to secure it, would be difficult to sustain. But the knowledge of the directors was disputed, and the jury may have found against it, which makes it of no particular moment here. The case thus comes down to whether there was any evidence that it was by means of his official relation that the money was secured. Upon that it is said that the defendant, although president, took no particular direction in the affairs of the bank, as might be implied, and shared no authority with the cashier to act for the directors between boards; and that there was nothing to show that by virtue of his office he constrained the cashier into making the loan, but, on the contrary, that he got it just as any one else would. But the case is not altogether so. It fails to regard several things. It will hardly be contended, for instance, that, if one unconnected with the bank had asked for a loan under similar circumstances, it would have gone through. It may possibly be that a customer of large and unquestioned means would have been able to get a loan of $10,000, for the purpose of stock speculation, on his own individual and unsecured note, even in the face of overdrafts and obligations of the magnitude and long standing that there were here. But not by any means the ordinary man, nor this defendant, aside from his official relation. In view of this, it is the natural, if not the inevitable, conclusion that it was out of favor to and in regard for his position as president, and so by virtue of it within the meaning of

the law, as the defendant had good reason to believe, that he got the money as he did. It is so remarkable and inexplicable upon any other basis that an inference to that effect was clearly warranted, and that is all that we need to know. Apart from this it is a question whether an officer of a national bank, directly or indirectly dealing with its funds can ever put the relation aside. But, without passing upon that, it is enough that in any degree it enters into it, of which there was sufficient evidence here.

I therefore concur that the judgment should be affirmed.