## MORRISSEY v. UNITED STATES.
### No. 7070.

Circuit Court of Appeals, Ninth Circuit.
Oct. 20, 1933.

SAWTELLE, Circuit Judge, dissenting.

David H. Cannon and Byron C. Hanna, both of Los Angeles, Cal., for appellant.

Peirson M. Hall, U. S. Atty., and John R. Layng, Asst. U. S. Atty., both of Los Angeles, Cal.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

The appellant, president of the Pacific National Bank of Los Angeles, Cal., a member bank of the Federal Reserve Banking System of the United States, was indicted, together with Anthony F. Swenson, executive vice president, Frank W. Shelton, assistant vice president, and Robert G. Johnston, cashier, of said bank, upon thirty-seven counts charging various violations of section 5209 of the Revised Statutes of the United States (12 USCA § 592). Arthur P. Adkisson and James M. O'Brien were charged as aiders and abettors. The first thirty-six counts charged substantive offenses under the statute and the thirty-seventh charged a conspiracy to violate the provisions of section 5209, R. S., by "misapplying and causing to be misapplied the moneys, funds and credits of said member bank, to the extent of about $528,000." In the conspiracy count the first thirty-six counts are referred to as overt acts, and in addition thereto sixteen overt acts are specified. All the defendants, except appellant, were acquitted of all charges, and the appellant was acquitted of all charges except the first seventeen counts. These counts charged the willful misapplication of the moneys, funds, and credits of the bank, "with intent to injure and defraud said member bank and divers other persons and corporations," by issuing certain cashier's checks aggregating $582,543.73. The appellant was sentenced to one year and one day on each of the seventeen counts upon which he was convicted. The sentence on counts 1 to 10 were to run consecutively, and from 11 to 17 to run concurrently with the sentence on count 1.

Before the consideration of the case, it should be stated that the appellee objects to the consideration of the bill of exceptions and moves to strike out the bill on the ground that it was settled after the expiration of the term, and therefore the federal court had lost jurisdiction. It appears from the record that, after the trial, the appellant secured a number of orders extending the time for the preparation of his proposed bill of exceptions. These orders were dated January 26, 1932, March 17, 1932, April 4, 1932, and April 21, 1932.

The first order extended the time 60 days after January 26; the next order 30 days after March 23; the next to May 1, 1932, and the last to May 10, 1932. The proposed bill was lodged with the clerk within the time fixed by the last order. Thereafter the United States attorney secured ex parte orders continuing the time "within which to serve proposed amendments to the proposed bill of exceptions." These orders were procured May 18, June 28, July 26, September 26, October 27, and November 9. The last order required the proposed amendments to be filed on or before November 18, 1932. The proposed amendments were served and filed within the period specified in the last order. The appellee's contention is that, although the orders procured by the appellant extend the term as well as the time for filing the proposed bill, the orders procured by the appellee merely extended the time for serving the proposed amendments. It has been held in numerous cases by the Circuit Court of Appeals in other circuits that the extension of time for filing of bills of exceptions operated to extend the term for the purpose of settling the bill. Ward v. Cochran, 150 U. S. 597, 14 S. Ct. 230, 37 L. Ed. 1195; Minahan v. Grand Trunk Western Ry. Co. (C. C. A.) 138 F. 37; Camden Iron Works Co. et al. v. Sater (C. C. A. 6) 223 F. 611; Cudahy Packing Co. v. City of Omaha (C. C. A. 8) 24 F.(2d) 3; Watjen et al. v. Louisville Tobacco Warehouse Co. (C. C. A.) 29 F.(2d) 801. The same rule would be applicable to orders extending time for serving proposed amendments. However, the proposed bill and amendments were not presented to the judge until long after the time fixed in the order for the filing of the proposed amendments. The difficulty thus presented, however, is not involved in the case at bar because of the fact that the first orders of the court extending the term and the time for filing the proposed bill of exceptions, not only extended both to a definite date, but also, in effect, extended the term until the bill of exceptions was settled and signed. The portion of the order referred to is as follows: "It is hereby ordered that the term and time for the signing and sealing of the bill of exceptions herein, as the same may be settled and signed, be, and the same is hereby extended for sixty days after the date hereof, and that whenever so settled and signed, the said bill of exceptions herein shall stand as settled, signed and filed, and made a part of the record herein, as of the 25th day of January, 1932, which 25th day of January, 1932 is within the original time allowed under the rules of this court for the presenting, sign-

ing and filing of said bill of exceptions herein."

It was stipulated that the order should be made in the foregoing form. The orders of March 17 and of April 21 extending the time and term were in the same form. We think that the orders in question extended the term of court until the bill of exceptions was signed. The appellee's motion is denied.

There is practically no dispute as to what was actually done by the defendants. At the opening of the trial, the attorney for the appellant made the following statement:

"Mr. Cannon. I will state, if the Court please, as far as Mr. Morrissey is concerned, we think there will be very few matters in dispute with respect to him. We admit the corporate entity of the bank and the fact it is a member of the Federal Reserve System, as alleged in the indictment. We think there will be no question as to the fact that these particular notes were executed, actually executed by the persons named in the indictment as being the signers of the notes. As far as Mr. Morrissey is concerned, there will be no dispute as to the fact the cashier's checks recited in the indictment were as a matter of fact issued by the Pacific National Bank. On those matters, so far as Mr. Morrissey is concerned, we are willing to stipulate on them for the purpose of expediting the trial and the only real issue so far as we now see it, as to Mr. Morrissey, is going to turn on the matter of intent anyway, and if by the making of stipulations of that kind as to the execution of those various documents, the trial can be expedited, we are very anxious to do that."

In defendant's opening statement, made after the government had rested, Mr. Cannon said, in part:

"Mr. Cannon. * * * I think the evidence here will show you that during the spring of 1929, and that summer and early fall, the bank was confronted with a very unusual situation. As a matter of fact, a grave situation, an extreme emergency; that these men in the conduct of the bank's business did those things the testimony will show they did do in absolute and entire good faith, without any intent to defraud or deceive anyone, and all of the acts that they performed in lending money, was done wholly and entirely with the idea of benefiting the bank and benefiting those interested in the bank, and not with the idea of deceiving or defrauding them.

"We think the evidence will clearly show that they did everything that was humanly possible for them to do for them to save the situation that was very very precarious, and that after all that testimony is in we think the jury will be well justified, in fact, compelled by the strength of those statements and the evidence that will be here adduced to find that there was no criminality here, and to acquit each and all of the defendants.

"Mr. Morrissey will take the stand in his own behalf, and will let you gentlemen know the motives that actuated him in performing his part in this episode and try if he can to give you men a word picture of the exact situation as it confronted the officials of the bank at that time."

We have made these quotations from statements of appellant's counsel to the court and jury for the purpose of making it clear that there is no substantial controversy as to the fact that the various transactions charged by the government occurred as charged, and that the defendants contended that, although the acts charged were in fact committed, they were performed with a good, and not with an evil, intent, to benefit and not to defraud the bank. With this preliminary statement we return to a more detailed statement of the facts involved in the case.

The charges involved all relate to the use of the funds of the Pacific National Bank for the purchase of stock in the Pacific National Company. This stock was purchased from time to time, and notes to cover the purchase price were executed by clerks and stenographers working in the bank who acted as dummies. It was known by the defendants that these persons were without financial responsibility. The notes were executed in the form used for unsecured notes, but the stock of the Pacific National Company thus purchased was deposited ostensibly as security for the payment of the notes. Some of these notes were signed by Arthur P. Adkisson, one of the defendants. Special reference will hereafter be made to this phase of the case. Stock thus purchased was sold from time to time as opportunity offered, and the proceeds credited upon the notes executed for the purchase price. The total amount of these notes aggregated $582,543.73, and the total amount remaining unpaid at the conclusion of the operations was $528,400.96. It thus appears that over half a million dollars of the Pacific National Bank, which will hereinafter be referred to as the bank, were used for the purchase of stock in the Pacific National Company, which will hereinafter be referred to as the company, in such fashion that, if a profit were made upon the transaction, it would be-

long to the defendants, as will hereinafter more fully appear, and, if there were a loss, it would be suffered by the bank. In short, although the bank became the equitable owner of the stock immediately upon its purchase, the transaction was so handled that it secured none of the advantages of ownership but only the hazards of such ownership. This was manifestly a fraud upon the bank and a misapplication of its funds. That it was done knowingly and intentionally cannot be doubted and is not seriously disputed. That the effect of the transaction was to defraud the bank is manifest, and this would be true whether the bank made a profit or suffered a loss upon the transaction. The appellant and his codefendants made no attempt to meet this situation except to claim that all the transactions referred to in the indictment were had with the purpose of benefiting the bank. The benefit claimed on behalf of the bank was not to result from the specific financial transaction but from the establishment of the bank's credit, which had been somewhat impaired by reason of the intimate connection of the bank with the company, which owned 83 per cent. of the stock of the bank. It is contended by the appellant, and by his associates who were acquitted, that the purchase and sale of the stock of the company engineered by them was for the purpose of sustaining the market value of that stock, and that their motive in sustaining the value of that stock was to sustain the credit of the bank. We therefore turn to a more detailed statement of the relationship between the bank and the company and of the various defendants to each.

The company owned 83 per cent. of the stock of the bank, all the stock of the Pacific National Building Company except one share of preferred stock, and, in addition, certain realty holdings. It also owned 660 shares of the Marine Securities Company.

Defendant Anthony F. Swenson owned 9,500 shares of the stock of the Marine Securities Company and was president of that company; he was vice president of the bank, and president of the company; and owned at various times between 5,000 and 17,000 shares of the stock of the company.

Defendant Frank W. Shelton was secretary of the Marine Securities Company and of the company; was a director and assistant vice president of the bank.

Defendant Robert G. Johnston was cashier of the bank, and treasurer of the Marine Securities Company.

Appellant Morrissey was a director and president of the bank, and vice president and director of the company.

Defendant Arthur P. Adkisson was a director of the bank, and vice president of the company on and after January 8, 1929.

Defendant James M. O'Brien was a director and vice president of the company.

In July 1928 the capital stock of the company was increased from $2,000,000 to $4,000,000. Apparently this was done with a view to taking over from the bank frozen assets of about $1,400,000, which had been objected to by the chief national bank examiner. A part of the increased capital stock was sold to the public, but a large part of it was subscribed by the defendants. In order to pay their subscriptions to the stock of the company the defendants borrowed large sums from the bank and deposited stock in the company as security therefor. The amounts borrowed are as follows:

| | |
|---|---:|
| Defendant R. G. Johnston (secured by 2775 shares of stock in the Company) | $114,500 |
| Defendant Frank W. Shelton (secured by 2775 shares of stock in the Company) | 100,000 |
| Defendant Anthony F. Swenson (secured by 7680 shares of stock in the Company) | 220,000 |
| Mary F. Swenson, mother of defendant Swenson, borrowed (secured by 4163 shares of stock in the Company) | 152,500 |
| Pacific National Company, unsecured, borrowed | 180,000 |
| Marine Securities Company, unsecured, borrowed | 115,000 |
| Pacific National Building Company, unsecured | 220,000 |
| These notes aggregate | $1,102,000 |

It will thus be observed that the million dollars paid by the company for the frozen assets of that amount which it took over from the bank was obtained from the bank upon the notes above mentioned, so that the net result of this transaction was that the bank exchanged its frozen assets for the obligations mentioned secured by the stock of the company, which stock of course represented an interest in the frozen or unproductive assets which had been transferred to the company by the bank.

On December 11, 1928, I. I. Chorpening, the chief national bank examiner of the Fifth Federal Reserve District, appeared before the

board of directors of the bank and called attention to the large line of credit, direct and indirect, with the Pacific National Company, and loans in the bank, secured by stock of that company, and particularly the amount of the above-mentioned notes aggregating $1,102,-000. Mr. Chorpening testified that he called the attention of the directors of the bank to these loans, and stated that the line of credit was unsatisfactory, even though it had been secured by stock or other collateral that was not in any way connected with the bank; that here was a bank loaning this large amount of money to a corporation which owned 83 per cent. of the bank. He testified: "I brought before the board the fact that a bank is forbidden by law to make loans to anyone on the security of its own stock, and while they were not directly loaning on their own stock, they were in effect doing so, inasmuch as the company to whom they were loaning money owned 80 per cent of the bank. I said that in my opinion, a million dollars of that line of credit should be eliminated from the bank immediately."

In July 1928 the capital of the bank was increased from $1,200,000 to $2,200,000; of this amount 80 per cent. was subscribed and paid for by the company.

Apparently as result of these transactions based upon the increase of the capital stock of the company and the bank, the bank secured about $1,000,000 in additional capital which resulted from the sale of $1,000,000 worth of the capital stock of the Pacific National Company to the public, and in addition was relieved of $1,000,000 of assets which had been objected to by the chief national bank examiner which had been exchanged for obligations of like amount secured by the stock of the company. A few months later, on March 8, 1929, the bank examiner returned to examine the bank and continued that examination until the 19th of March.

At this juncture it should be noted that, in stating the facts where there is a conflict in the evidence or in the inferences to be drawn therefrom, we must, in support of the verdict of the jury, assume the facts and the inferences most strongly against the appellant, and must assume that all conflicts in the evidence were resolved against the defendant. We return to a statement of the facts.

During the period that Mr. Chorpening was examining the bank the appellant employed defendant Adkisson to purchase stock in the company which was being then offered for sale. The stockbroker engaged for the purpose of buying and selling stock of the company on the stock exchange was employed on March 16, 1929, and was told that "they were going to clean up the market on the stock." Between March 16 and 23 these brokers purchased 7,046 shares of stock in the company at $38 per share; 2,646 shares had been delivered to the brokers and 4,400 of the shares had been resold to the general public. No one was present at this arrangement with the stockbrokers except appellant Morrissey and Adkisson. On March 19 the bank examiner apparently concluded his examination. The brokers having presented 2,072 shares of the company's stock which they had purchased for $78,700, requested payment therefor in that amount. In order to pay for 500 shares which were delivered March 21, two days after the bank examiner had left the bank, defendant Adkisson arranged with Morrissey that he would sign a note for the amount of its purchase price, $18,978.50. On the next day 802 shares of stock were delivered, and a note was executed by Adkisson for $30,979.11, and, on March 25, 1,344 shares were delivered, for which a note for $54,175 was executed. Thus, within six days after the bank examiner had concluded his examination, Adkisson executed notes aggregating $104,141.61, the purchase price of 2,646 shares of stock in the company which was deposited as security for the notes. In addition thereto, there was at that time 2,130 shares of the company's stock in the hands of the broker calling for additional payment of $80,940. In this situation appellant, Morrissey, called in the other defendants and suggested the organization of a pool for operations in the stock of the company. This suggestion was made without disclosing to the other defendants that up to that time obligations had been incurred aggregating over $85,000 for the purchase of stock of the company. The exact agreement between the defendants in connection with this pool is in some doubt. The other defendants were apparently of the impression that the obligation each assumed was to prorate 2,000 shares, that is, for each one to pay for one-sixth of 2,000 shares of stock, or 333⅓ shares for each defendant, although, as stated, obligations had already been incurred under the direction of Morrissey for the payment for over twice that amount of stock. After this agreement among the defendants, which was oral, the brokers, operating under the direction of the appellant, purchased a large amount of the stock of the company. This stock was purchased in each instance with funds of the

bank obtained therefrom by the device of a dummy note executed by an employee of the bank who was financially irresponsible, and the issuance of a certified check for the amount paid for the stock, ostensibly upon the dummy note, but really for payment to the brokers for stock delivered by them to the officers of the bank. These notes so executed as above stated aggregated $582,000. One of the notes was executed in the same manner, however, to pay for 1,000 shares of stock in the Sampson Tire & Rubber Company on April 10, 1929, purchased for $23,000, and on May 6, 1929, 100 shares of the National Bank of Commerce stock purchased for $49,-200. These amounts are included in the $582,-000.

The agreed purpose of the pool, as testified to by the defendants, was to remove from the market 2,000 shares of the company stock which was in the hands of speculators and being offered from time to time upon the market and thus adversely affecting the market price of the stock of the company and indirectly the credit of the bank. The operations, however, resulted in the use of the funds of the bank for the purchase of more than 12,-088½ shares of the company's stock which were paid for with the funds of the bank by the device mentioned. The shares on hand August 25, 1929, aggregated 12,280.

■ In the most favorable aspect of the situation, the appellant, who was president of the bank, agreed to the use of its funds for the purpose of speculating in the stock of a company in which he was financially interested and of which he was an officer and director, in such manner that the bank would hazard the loss of its funds, without any corresponding advantage other than the payment of interest if the deal were successful. Appellant's contention, bluntly stated, is that this use of the funds of the bank for speculative purposes was justifiable because it tended to maintain the financial standing of the bank. While the question of good faith is one for the jury, it is manifest that it took an extremely liberal view of the case in dealing with the other defendants and in concluding that there was a reasonable doubt of their guilt. We need not, however, consider that question except as it bears upon the contentions of the appellant, whose actions the jury found to have been committed in bad faith.

■ Appellant claims that the evidence is insufficient to support the verdict on counts 1 to 17, inclusive. This claim is largely predicated upon the proposition that all the defendants having been acquitted of conspiracy, and, most of the transactions alleged in the complaint having been done or had by defendants other than the appellant, that the verdict of guilty upon the first seventeen counts can only be sustained upon the theory of conspiracy, and that, all the defendants having been acquitted of conspiracy, there is no evidence sufficient to sustain the verdict. The appellant puts the question thus: "The question then arises. Can the theory of conspiracy be invoked to sustain the conviction of appellant on the substantive offenses, in view of the acquittal of appellant and the other defendants upon the identical allegations embraced in the conspiracy count?"

The answer to this question is, "yes." Borum v. U. S., 284 U. S. 596, 52 S. Ct. 205, 76 L. Ed. 513, citing Dunn v. U. S., 284 U. S. 390, 52 S. Ct. 189, 76 L. Ed. 356, 80 A. L. R. 161.

■ Appellant insists that he is not seeking to overturn the verdict of acquittal on the ground of inconsistency between the verdict on the thirty-seventh count charging conspiracy and the verdict of guilty on the first seventeen counts, and states: "The conspiracy theory must be rejected, since that question is res judicata by the verdict of the jury on the conspiracy count." This is but another form of stating that the verdict of the jury must be consistent. However, we do not think the question stated by counsel arises in the case. It is true that many of the acts performed in connection with the transaction in question were performed by others; but they were performed with the knowledge and consent of the appellant and in furtherance of his purpose. We may assume that there is a reasonable doubt as to the complicity of these agents in the transaction, but the jury evidently entertained no reasonable doubt as to the criminal conduct of the appellant in causing these things to be done. In this connection it should be stated that the theory of the government upon the appeal, and no doubt upon the trial, was that the appellant had a distinct purpose of his own in authorizing and bringing about the purchase of the stock of the company. Briefly stated, this purpose was to acquire the controlling interest in the company, and thus, in the bank, and take care of the purchase price of the stock by selling the same to a group of friends who had agreed to purchase such stock for the sum of $500,000. According to this theory, which the jury may have accepted, the other defendants, in their agreement with the appellant to participate in a pool for the purchase of stock amounting to

2,000 shares or more, as the case may be, were actuated by a bona fide desire to benefit the bank, while the appellant, on the other hand, aimed to secure a controlling interest in the bank, not only by using the funds of the bank for that purpose, but also by securing the co-operation of his codefendants in the manipulation of the funds of the bank to accomplish that purpose. There was evidence upon which the jury might have reached this conclusion and might have determined that the appellant's culpability was greater than that of the codefendants. We need not, however, enter further upon a discussion of the evidence in this regard for the reason that the evidence was sufficient to sustain the conviction of the appellant and the acquittal of his codefendants is a false quantity in the consideration of that question.

Appellant urges for separate consideration the contention that the verdict on the second count is not sustained by the evidence. This upon the theory that, when Adkisson executed a note for $54,175 on March 25, 1929, the transaction was a bona fide one, and the execution of the note by Adkisson to take care of the first amount due on purchase of stock in the company was an accommodation for the appellant or for those in the pool. This argument is based on the testimony of Arthur P. Adkisson, one of the defendants, to the effect that he "told Mr. Morrissey of the situation and that if no other arrangement had been made I would be willing to sign a note for it and take care of it that way as a temporary measure. He said it would be all right; to go ahead and do it. On that day my total liability, including this note, was $61,787." This testimony relates to a transaction concerning 500 shares of stock for which the amount due was $18,987.50. He testified that in all 1,344 shares of stock were delivered on that day with a bill for $54,175 for which he executed a note. The witness stated: "I believed that I could take care of that note and had no wrongful intention and believed I was performing my duties as an employee of the Pacific National Company. The balance unpaid on that note is $49,998.84. I have not been able to pay it."

The jury may have wholly disbelieved this testimony and believed that this note was signed and the money advanced thereon was in pursuance of appellant's plan to gain control of the stock of the company, and that the transaction was a loan in form only. In this connection it should also be stated that this ostensible loan was not passed upon by the board of directors or by the loan committee of the bank (there was evidence to the contrary), and was made solely upon the responsibility and direction of the appellant. The jury was entitled to consider the whole situation presented by the evidence in determining whether or not the transaction of March 25, 1929 was bona fide. Its verdict was supported by substantial evidence.

Assignment XLII dealt with in appellant's brief under the head of "Errors in Instructions, Item A," is as follows: "A reckless act is to be regarded as the equivalent of a wilful one. Thus, in the present case, if you find beyond a reasonable doubt that the defendants, or any of them, misapplied the moneys of the Pacific National Bank with reckless disregard of the protection of the Bank, such action is to be considered as a wilful misapplication of the funds of the Bank on the part of such defendants."

The argument of counsel is directed in the main to the first sentence, "A reckless act is to be regarded as the equivalent of a wilful one." This statement is apparently taken from the opinion of Judge Archbald in Lear v. U. S. (C. C. A.) 147 F. 349, 359. See Walsh v. U. S. (C. C. A.) 174 F. 615, 618. Whether or not this bald statement is correct, either philosophically or legally, is not involved in the case. The instruction must be considered as a whole, and this instruction was reaffirmed by the court in response to questions by a juror, and subsequently upon exception taken was modified by the court to harmonize with the views of counsel, and they took no exception to the instruction as thus modified.

In view of the fact that this is one of the most serious questions presented by the appellant, we are under the necessity of quoting somewhat at length from the instructions in that regard. The instructions were very full and cover 55 pages of the transcript. We quote therefrom as follows:

"The opinion of the judge as to the guilt or innocence of a defendant, if directly or inferentially expressed in these instructions or at any time during the trial, is not binding upon the jury. For to the jury exclusively belongs the duty of determining the facts. The law, you must accept from the court as correctly declared in these instructions. * * *

" * * * All the inferences and presumptions consistent with the facts proven are to be drawn and indulged in favor of innocence of the defendants. No fact or circumstance upon which a conclusion of guilty may be based is sufficient unless such fact or

circumstance has been proven beyond a reasonable doubt and to the same extent as if the whole conclusion dependent upon one fact or circumstance."

The court instructed the jury as to the effect of section 5209, R. S. (12 USCA § 592) that the material portions of the statute under which the first thirty-six counts of the indictment are based, provide that:

"Any officer * * * of any Federal Reserve Bank or of any member bank * * * who wilfully misapplies any of the moneys * * * of such Federal Reserve Bank or member bank, or who without authority from the directors of such Federal Reserve Bank or member bank, draws any order or bill of exchange * * * with intent in any case to injure or defraud such * * * bank or any other company * * * shall be deemed guilty of the offense charged."

" * * * In order to find a criminal, wilful misapplication of the funds of the bank, by these defendants, or any of them, you must find that such defendant or those defendants whom you find justly charged with the crime, if you do so find, did, without authority, by the acts charged in the indictment and by said wilful misapplication, deprive the bank of its property, that is, its moneys, funds or credits, either permanently or for an indefinite period.

"The essence of the charge of misapplication is that the moneys or funds of the bank were knowingly, wilfully and unlawfully misapplied, with the intent to injure and defraud the bank. * * *

"If a bank were amply secured, such fact would, as a matter of logic, be inconsistent with an intent to defraud the bank, but if the security is not reasonable in any respect, and you find beyond a reasonable doubt that the intent to defraud and injure the bank existed, then, the fact that some security was given would not be a defense to the charge. * * *

"The question of intent is to be determined by the facts and circumstances and the surroundings at the time of the transaction. The law presumes that every party who in any way attempts anything by any guarantee or anything of that kind which is dependent upon future successful operations, takes the risk of the success and that if a person commits an offense with the intent of temporarily injuring or defrauding another party or a banking institution, although it may be his intent at the time to finally recompense or prevent any injury resulting from such act, he is not protected by such intent to finally correct the temporary wrong deed. In this case if you are satisfied beyond a reasonable doubt that the defendants caused stock to be purchased as charged in the indictment with funds of the Pacific National Bank and had notes signed to the said Bank by persons financially irresponsible therefor, with the intent for the time being to injure the Bank and take wrongful advantage of its credit and make wrongful use of its money in purchasing the said stock, it does not matter that at the same time the defendants, or any of them had an intent in the future to remedy or repay any injury that might be done to the Bank and such intent in the future to remedy or repay any such injury to the Bank would not be a defense, but the intent to temporarily injure the Bank or use its money wrongfully is a sufficient intent to justify a verdict of guilty irrespective of the intent in the future to remedy the injury or repay the money. The wrongful intent is presumed from the doing of the wrongful or fraudulent act. One is presumed to intend the necessary and natural result of his wilful and deliberate act. The law presumes that each man intends the legitimate consequences of his own acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proven to have been knowingly committed. There is a well settled rule that the law applies in both civil and criminal cases that the intent is presumed and inferred from the result of the action. If, therefore, the funds, moneys or credit of the Pacific National Bank are shown to have been wilfully misapplied by the accused, and converted to their own use or to the use of anyone else whereby as a necessary, natural or legitimate consequence the bank's capital was reduced or placed beyond the control of its directors or its ability to meet its engagements or obligations or to continue its business was lessened or destroyed, the intent to injure or defraud the bank may be presumed. Even though you are convinced beyond a reasonable doubt that the defendants herein or some one or all of them were operating a pool in the name of the Pacific National Company but for their own account and not for the account and/or the benefit of the Company and/or the Bank, that fact standing alone would not justify you in finding such defendant or defendants guilty under any of the counts in the indictment. However, that fact, if you find it to be such, is a circumstance which you may

consider, in conjunction with the rest of the evidence in passing upon the question of the guilt or innocence of any of the defendants.

\* \* \*

"Your practical experience and daily observation of the acts and intents of men will materially aid you in determining the question of intention in this case. In this behalf it is, of course, obvious that you are not to be concluded and controlled by the fact that the defendants have each of them separately disavowed in their testimony all intention to defraud, as charged in the misapplication counts of the indictment, and those counts charging the issuance of cashier's checks on the transaction and the intent to deceive, as charged under the Bank and the reports of the comptroller. If a denial of the existence of such intention were to be accepted as conclusive and controlling, it would be extremely difficult, if ever possible, to prove the existence of a fraudulent or other criminal intent. The intent with which an act is done is often more clearly and conclusively shown by the act itself or by a series of acts than by any other words or explanations of the actor. In many cases the actions of men speak their intentions more clearly and truthfully than do their words.

"As heretofore pointed out, counts 1 to 17, both inclusive, charge that the defendants Morrissey, Swensen, Shelton and Johnston wilfully and unlawfully misapplied certain of the moneys, funds and credits of the Pacific National Bank of Los Angeles, California. Before you can find those defendants or any of them guilty under any of those counts, you must find, beyond all reasonable doubt, first, that such defendants did misapply the moneys, funds or credits of the Bank as set out in the particular counts; second, that such misapplication was made wilfully and wrongfully, with intent to injure or defraud the Bank or some other person or Company who was then and there a shareholder, depositor or creditor of the Bank.

"And third, that the moneys, funds or credits so misapplied, were converted to the defendants' own use, or to the use of some other person than the Bank.

"If you fail to find as a fact any one of these elements as to any one of the defendants on any one of the counts numbered 1 to 17, you are required under the law to return a verdict of not guilty against such defendant or defendants, on such count or counts. In other words, you must find beyond all reasonable doubt the existence of each of the foregoing elements as to each defendant in each of the counts numbered 1 to 17, before you would be justified in finding such defendant guilty under any such count.

"The law under which these defendants are charged requires that the acts complained of in the indictment be wilfully done by the defendant. In other words, you must find beyond all reasonable doubt before you can find any one or all of the defendants guilty, that such defendant or defendants wilfully did the thing complained of in the indictment.

"Wilfully implies on the part of an officer or agent knowledge and purpose to do wrong. Something more is required than an act of making a bad loan, or issuing a cashier's check against a note, which is of less value than that at which it was accepted by the bank, or the making of an entry on the books and records of the bank that is not altogether correct. The doing or omitting to do a thing knowingly and wilfully implies not only a knowledge of the thing but a determination with a bad intent to do it or to omit doing it. The word 'wilfully' in the ordinary sense in which it is used in the statutes means not merely 'voluntarily,' but with a bad purpose. It is frequently understood as signifying an evil intent without justifiable excuse.

"Bad loans made in good faith do not subject the officers to any criminal liability. Where bank officers in the honest exercise of an official discretion, in good faith and without fraud, make loans or discounts for the actual or supposed advantage of the Bank, there is no criminal responsibility although the transaction may be injudicious and unsafe, and even though the transaction results in a loss or damage to the Bank or to some other person or corporation.

"A loan made by an officer or officers of the Pacific National Bank in an exercise of his judgment, if not accompanied by an intent to injure or defraud the said Bank or its shareholders, depositors or credits, does not constitute a misapplication of the moneys, funds or credits of such Bank, even though the person upon whose notes the said moneys, funds or credits were so loaned, has no property or other means of meeting payment on such notes when due.

"So far as the question of guilt or innocence of an officer of the Bank under the statute is concerned, there is no distinction between an advance or a loan in bad faith for the purpose of defrauding the Bank, and an application of the moneys, funds or credits of the Bank with like intent in a form other than the loan. \* \* \*

"If such officer, within the scope of his powers and duties, wilfully abuses such powers and duties by discounting notes which he knew to be worthless and did this with the intent to defraud the Bank, he is guilty of misapplying the funds of the Bank to the same extent as if he had misapplied the funds by acting beyond and without the scope of his authority.

"A reckless act is to be regarded as the equivalent of a wilful one. Thus, in the present case, if you find beyond a reasonable doubt that the defendants, or any of them, misapplied the moneys of the Pacific National Bank with reckless disregard of the protection of the Bank, such action is to be considered as a wilful misapplication of the funds of the Bank on the part of such defendants.

"Good faith of the defendants, and of each of them, or their bad faith, in these matters, is to be determined, and their several acts and declarations are to be construed and interpreted by the conditions existing at the time such statements were made or acts performed and are to be considered by you as they appeared to them at that time, and are not to be considered by you as they might appear from looking back at the situation in the light of subsequent developments.

"The defendants are not on trial for errors of judgment. They are on trial for certain alleged criminal offenses, and an essential element of each of such offenses is an evil or criminal intent, which intent it is incumbent upon the government to prove to your satisfaction beyond all reasonable doubt; and if, under all the evidence in the case, the government has failed to prove the existence of such evil or criminal intent in the minds of the defendants or any of them, then it is your duty to acquit each defendant as to whom you find there is such failure of proof. * * *

"An intent to injure or defraud, as contemplated by the statute, is not inconsistent with the desire for the ultimate success or welfare of the Bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the Bank. A wrongful misapplication of funds, even if made in the hope or belief that the Bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the Bank. * * *

"The criminality really depends upon the question of whether there was at the time of the purported discount or loan, a deliberate intent on the part of the defendant to defraud the Bank. Thus in the present case if you believe beyond a reasonable doubt that the Bank's money was paid out by the officers of the Bank to the persons who signed these notes or the persons for whom the signers were acting, without a belief on the part of the makers or the officers of the Bank that the moneys could be repaid at the maturity of the note and with the intent that it would be paid back if the operations of the defendants in the stock market were successful, but would be lost to the Bank if unsuccessful, then such intent is sufficient to justify a verdict of guilty on your part. * * *

"It is the province of the judge in a Federal Court to comment upon the evidence, at the same time admonishing the jury that what the court has to say in that regard is in no way binding upon the jury; that in the final analysis the jurors have the exclusive right to determine the facts. * * *

"It is not our purpose, in spite of the fears of some counsel, to undertake to make comments on the evidence or otherwise in detail, or undertake to advise this jury what the court thinks about the weight and effect of the evidence."

At the conclusion of the instructions, from which we have quoted a part only, the following colloquy occurred with reference to the instruction concerning the reckless disposal of funds:

"You say you had another question?

"The Juror: Yes. The other question was, you spoke of one act being, or having the same effect as a wilful misapplication, being a reckless disposal of funds, or something to that effect. Now, what I wanted to know was whether the same presumption as to intent applied in that case as to a wilful misapplication.

"The Court: Perhaps this is the instruction to which the juror's question is directed: 'A reckless act is to be regarded as the equivalent of a wilful one.'

"The Juror: Yes.

"The Court: (Reading) Thus, in the present case if you find beyond a reasonable doubt that the defendants or any of them misapplied the moneys of the Pacific National Bank with reckless disregard of the protection of the bank, such action may be considered as a wilful misapplication of the funds of the bank.

"The Juror: Then, in that case according to your wording there, the same presumption as to intent to defraud would be drawn from

that fact? As you stated, I believe, before, that from a wilful misapplication the presumption was that there was an intent to defraud?

"The Court: That is correct.

"The Juror: Then, would that same presumption follow in the case of a reckless misapplication?

"The Court: Under the conditions just read in this instruction.

"The Juror: Yes.

"The Court: That is correct.

"Mr Cannon: May at this time, I don't know whether your Honor desires us to take our exceptions in the presence or in the absence of the jury, but while this particular matter is before the Court, I would like to take an exception on behalf of all the defendants to that particular instruction as not being an exact statement of the law and particularly to that part of the instruction which seems to instruct the jury that they can indulge in presumptions against the defendants.

"Mr. Armstrong: And particularly, if your Honor pleases, upon the ground that intent should not be presumed from one particular act or fact but must be, it must be determined from all the facts and circumstances in the case including as well the testimony of the defendants.

"The Court: That statement of counsel is quite correct, and the court has not stated and the jury should not understand that the court is stating that they are to disregard any other evidence in the case in determining the question of intent. It is not possible to incorporate in a single instruction all of the elements that go to establish the question of guilt or innocence with reference to a particular count. The jurors must understand that all these instructions constitute the whole charge and you cannot disregard any part of it.

"Mr. Ford: Then I understand, your Honor, that the effect of the Court's remark is to advise the jury that recklessness on the part of any officer or person is to be regarded merely as a circumstance from which, in connection with all the evidence in the case, they are to determine the real intent of the parties?

"The Court: That is correct.

"Mr. Ford: And that they are not required to presume an intent to defraud from the mere recklessness of the person who made it. That is a matter for their judgment and understanding.

"The Court: That is correct.

"Mr. Cannon: Does your Honor desire our other exceptions taken now or in the absence of the jury? * * *"

It will be observed that toward the conclusion of the colloquy the court, in the presence of the jury, acquiesced in the contention of the appellant, speaking through Mr. Ford, to the effect that the jury was not required as a matter of law to presume an intent to defraud from mere recklessness, that the matter of intent was for the consideration of the jury. In view of this modification of the court's instructions to comply with the contentions of the appellant, and in view of the fact that no exception was taken to the instruction as thus modified, the assignment of error under consideration is based on an exception which was expressly waived. Moreover, we think the instruction as modified was a correct statement of the law as applicable to the facts in the case. Indeed, it is difficult to determine from the record what reckless acts, if any, were referred to by the court, and in this we are not enlightened by counsel on either side. All the actions involved in the transaction were done willfully, understandingly, knowingly, and intentionally. The defendants knew that the persons who signed the notes were not financially responsible, and that the notes were worthless except as supported by the stock considered as collateral therefor. The only sense in which the conduct of the appellant or his codefendants could be considered as reckless was in the disregard of the consequences to the bank, but these consequences were the direct and inevitable result of their conduct and known by them to be such. We cannot see that the instruction, after modification, was prejudicial, even if erroneous, and, with the modification assented to by the defendants, of course, no error was committed.

█ The next specification in appellant's brief is under the heading of "Errors in Instructions, Item B," and, it is stated, is based on assignment XXIV. This assignment is as follows: "Said District Court erred in denying the motions and/or in overruling the objections set out in the proposed bill of exceptions this day lodged with the clerk of the said District Court, and which said exceptions are numbered in the said proposed bill of exceptions from Nos. 1 to 83 inclusive."

This assignment does not conform to our rule No. 11 and cannot be considered. This general assignment was made as a further and additional assignment on May 10, 1932; the original assignments having been made January 15, 1931. The assignment was made at

the time of the filing of appellant's proposed bill of exceptions, and was in pursuance of the original assignment, which prayed leave to file an amended and additional assignment of errors within thirty days after the sealing, settling, and filing of the bill of exceptions herein.

Notwithstanding the absence of assignment, this court might, and has in some instances, considered grave errors affecting the substantial rights of the parties. We have therefore examined the various errors referred to, and see no reason for treating such exceptions under the rule stated.

The appellant addresses a portion of his brief to the prejudicial acts of the District Judge. None of these acts so specified were assigned as error other than by assignment XLIV above referred to. Of twenty items thus set forth exceptions were taken to seventeen. We have nevertheless examined the various items referred to and find no basis for the contention that the judge was guilty of prejudicial misconduct. It should be stated in this connection perhaps that the appellant concedes "that the District Court in the acts hereinafter complained of was entirely free from any personal hostility or prejudice entertained toward this appellant, and was actuated solely by the desire to perform what he conceived to be his duty. We are confident that he did not consciously or knowingly express any utterance or perform any acts throughout the trial of this case which he considered to be unfair or prejudicial to this appellant."

It is true that this concession is followed by a statement that counsel believed "that certain of his acts at the trial were highly prejudicial to the defendants, and particularly to this appellant, and that he so conducted himself as to create the appearance of hostility to the defendants and to this appellant, resulting, we believe, in a grave injustice to this appellant."

The claim of prejudicial misconduct is largely based upon the attempts of the court at various times during the trial to expedite the trial of the case and to clarify statements of the witnesses. In so doing the judge was performing the duties of his responsible position. It is the duty of the trial judge to be fair to the government as well as to the defendant in a criminal case. Questions directed by the court to witnesses for the purpose of clarifying ambiguities in the testimony resulting from the manner of the witnesses' examination are proper and desirable.

Judgment affirmed.

SAWTELLE, Circuit Judge (dissenting).

In order to appreciate the importance of the inquiry made by one of the jurors, and of the court's reply thereto, it will be necessary to repeat here portions of the record as set forth in the majority opinion. As stated in that opinion, at the beginning of the trial appellant's attorney made the following statement:

"Mr. Cannon: I will state, if the Court please, as far as Mr. Morrissey is concerned, we think there will be very few matters in dispute with respect to him. We admit the corporate entity of the bank and the fact it is a member of the Federal Reserve System, as alleged in the indictment. We think there will be no question as to the fact that these particular notes were executed, actually executed by the persons named in the indictment as being the signers of the notes. As far as Mr. Morrissey is concerned, there will be no dispute as to the fact the cashier's checks recited in the indictment were as a matter of fact issued by the Pacific National Bank. On those matters so far as Mr. Morrissey is concerned, we are willing to stipulate on them for the purpose of expediting the trial and the only real issue so far as we now see it, as to Mr. Morrissey, is going to turn on the matter of intent anyway, and if by the making of stipulations of that kind as to the execution of those various documents, the trial can be expedited, we are very anxious to do that."

It will thus be seen that appellant's defense was that of good faith—"the matter of intent." The learned judge instructed the jury that: "The intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proven to have been knowingly committed."

And that: "A reckless act is to be regarded as the equivalent of a wilful one. Thus, in the present case, if you find beyond a reasonable doubt that the defendants, or any of them, misapplied the moneys of the Pacific National Bank with reckless disregard of the protection of the Bank, such action is to be considered as a wilful misapplication of the funds of the Bank on the part of such defendants."

One of the jurors, who had evidently been impressed by the instructions to the effect that "the intent to injure or defraud is presumed when the unlawful act which results in loss or injury is proven to have been knowingly committed", asked the court, in effect, whether the same presumption applied to reckless misapplication of funds. The court's reply is set forth in the majority opinion.

The juror was told that the same presumption followed in the case of a reckless misapplication. I do not think this is a correct statement of the law. It is claimed, however, that, in the colloquy which followed between the court and counsel, the court acquiesced in the contention of counsel and modified the instructions accordingly. I do not think this is correct. It did not cure the error, but rather emphasized it. The question was not whether the jury were "required to presume an intent to defraud from mere recklessness," but, rather, whether as a matter of law an intent to defraud is presumed from the doing of reckless acts. This so-called modification of the instruction was in fact no modification at all, and the erroneous instructions as to the right of the jury to presume an intent to defraud from a "reckless misapplication of funds" was never withdrawn.

The statute is directed, not against a reckless misapplication of funds, but against a willful misapplication thereof with intent to defraud. One might recklessly, rashly, negligently, or foolishly loan money of a bank without requiring proper security, or otherwise observing good business methods, but that would not be a misapplication of the funds within the meaning of the statute. The intent to defraud is the gist of the offense charged.

I think the instruction given was prejudicial, and the judgment should be reversed.