### SUETTER v. UNITED STATES.
### No. 10300.

Circuit Court of Appeals, Ninth Circuit.

Jan. 18, 1944.

104

William J. Prendergast, Jr., and David Weinstein, both of Portland, Or., for appellant.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., Robert S. Rubin, Sp. Counsel, of Philadelphia, Pa., Charles E. Wright, of Portland, Or., and Theodore L. Thau, of Philadelphia, Pa., for appellee.

Before GARRECHT, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

An indictment containing seven counts was filed against appellant. The first two counts charged him with using the mails in connection with a scheme to defraud, contrary to the terms of § 338 of Title 18 U.S.C.A.[1] The other five counts charged him with using the mails in furtherance of a scheme to defraud in the sale of securities, contrary to the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (1).[2] The term "sale" is defined by § 77b(3), Title 15 U.S. C.A., as including every "contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."

The first count in the indictment outlines the plan to defraud, which plan is incorporated by reference in each of the other six counts. The fraudulent design is alleged as follows. Between 1934 and 1941 appellant intended to defraud a certain class of persons, including eight named individuals. He bought gold mining claims in Josephine County, Oregon, and called them the Suetter Placer Mines. In 1937

---

[1] 18 U.S.C.A. § 338: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter * * * in any post office, or station thereof, or street or other letter box of the United States, or authorized depository for mail matter, to be sent or delivered by the post office establishment of the United States, or shall take or receive any such therefrom, * * * or shall knowingly cause to be delivered by mail according to the direction thereon, * * * any such letter * * * shall be fined not more than $1,000, or imprisoned not more than five years, or both."

[2] 15 U.S.C.A. § 77q; "Fraudulent interstate transactions

"(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, * * *."

he executed a trust agreement to the effect that he would administer the claims for the benefit of purchasers of units in the Suetter Placer Mines, and that each purchaser was entitled to a pro rata share of the income from the mines. To induce persons to buy such units and to lull them into a false sense of security with respect to their investments so that appellant could convert to his own use a large part of the investors' money and other property, and to induce persons to retain their interests, appellant made various false and fraudulent representations by means of letters, other written communications, and oral statements. He represented falsely that he had absolute title to the Suetter Placer Mines; that he would keep an accurate set of accounts; that employees of the Link-Belt Company of Chicago had agreed to invest $80,000 in the mines; that all of the money invested would be used to buy machinery and to defray expenses in connection with the operation of the mines; that investors would realize large returns on their investments; that the units were a safe, sound and conservative investment; that engineers hired to test the properties had submitted a favorable report; that production would be commenced by the fall of 1937; that appellant had a good deal of practical experience in mining and had been financially successful; that he had invested over $50,-000 of his own funds in the mines; that an investment of $300,000 would bring returns of from one to three million dollars within three years; that he would begin shipping gold to the mint within ninety days after December, 1938; that the mines would pay dividends of 20% of $100,000,000, that the property of the mines was proven; and that investors would never lose the money invested.

Counts one and two, involving mail fraud, are based on two letters mailed to Paul P. Rhode, one of those listed among the persons to be defrauded. The remaining counts, involving fraud in the sale of securities, are based on various communications—counts three and four on two letters to Francis J. Beckman, count five on a telegram to Stephen A. Bubacz, and counts six and seven on two letters from and to Rhode.

The jury found appellant guilty on counts three, four, six and seven, and not guilty on the other counts. Upon a motion for a new trial the court dismissed counts three and four. Thereafter, appellant was sentenced to a two and one-half year term of imprisonment under each of counts six and seven, the sentences to run concurrently.

The evidence discloses the following facts. Phillip Suetter in 1927 was a trader in horses and livestock. He became bankrupt in 1933 and thereafter went into the business of mining. In 1934 he purchased placer mining claims in Josephine County, Oregon. Ralph T. Montag largely financed the acquisition of the property and its early operation. In return Montag received a half-interest in the claims and Suetter's promissory note for $10,000 secured by a mortgage on the claims. When Montag could contribute no more, Suetter sought funds from others and wrote that he would return a large part of Montag's investment from the first of the funds received. Montag testified that Suetter had made no misrepresentations to him and that he had been aware of most of Suetter's doings.

In order to raise additional needed capital, Suetter determined to sell certificates of ownership in his mines in the forms of units governed by a trust agreement. In that document Suetter declared that he had taken title as trustee to listed mining claims, that the claims should consist of undivided units, and that he should have the management of the properties and should keep accurate accounts of income and disbursements. He specifically agreed to use the proceeds from the sale of units for the purchase of machinery and equipment necessary to the operation of the properties. All purchasers of units had seen copies of the trust agreement before they invested in Suetter's project.

Ed Hogan tried to obtain financial help for Suetter in the east. For this service Suetter promised to allow him a 20% commission on the sums raised and a 5% interest in the mine. Hogan succeeded in selling several units.

Suetter followed Hogan to Chicago. There, he entered into negotiations with William Phillips, sales engineer for the Link-Belt Company, contemplating the purchase of mining equipment. He told Phillips that he was "properly financed." Phillips had gravel from the mines tested as to metallic content and found the results "very satisfactory." Phillips praised the properties highly to certain of Suetter's prospects, showed them pictures of a dredge similar

to the one Suetter planned to buy, and gave Suetter a photographic cut of that dredge, which cut Suetter used at the head of the certificates for trust units. After making a trip to the properties and finding them undeveloped, Phillips requested, and received, the return of all money invested by employees of his company.

Suetter told Beckman that he was sole owner of the claims and had clear title thereto. He explained that he had returned money to the Link-Belt employees because he had decided not to buy any equipment from that company. Beckman discussed the properties with Phillips and with his personal mining engineer, and over a period of years invested a large sum in the mines. In March, 1938, Suetter and Beckman signed an instrument supplemental to the trust agreement. Therein the former promised to send all net proceeds from the mines to Beckman until the latter's promissory notes issued on the mining project were fully paid, stated that he owned clear title to the premises and declared that he had invested $95,000 of his personal funds in the mines. In the instant case Beckman testified that Suetter was to pay expenses and buy machinery with the money advanced to him. By 1938 Beckman knew that Montag had an interest in the mine, but Suetter informed him that Montag's share came from Suetter's interest. Upon learning that Suetter had acquired other properties, Beckman criticized the fact that operations were not confined to the original, or Josephine, properties. Suetter remarked: "The Josephine is no good. There are too many boulders. You can't work the Josephine." In 1939 Beckman sued Suetter for an accounting and an injunction. A settlement was reached under which Suetter turned over to Beckman all of his mining properties except the Josephine mines, and Beckman assumed the claims of Rhode and Bubacz.

Rhode invested $30,000 in trust units only after a careful study of the trust agreement, which he found "satisfactory." He had discussed the mines and the trust agreement with Bubacz before he first met Suetter, at which time he invested $5,000 in the mines. He testified that he relied on Suetter's statements as to the value and ownership of the units: that he, Suetter, had clear and legal title to the property; that gold values in the gravel were such that with capital, a purchase of machinery,

and work at a depth "considerable recovery" could be had; "that miners and experts in mining had been consulted and that they agreed that there was value there that had not as yet been touched"; that twenty holes had been sunk throughout the property, and that the showing confirmed the findings of the experts; and that on the basis of that showing the recovery would amount to from twenty to fifty million dollars. Suetter once showed Rhode a bottle of black gold dust, which he said had the highest possible content of gold, and commented that "there was gold practically everywhere you would throw a pickaxe" on the property. Rhode averred that he invested the money on his own responsibility "trusting what I heard in regard to Mr. Suetter" "and what I learned from time to time from Mr. Suetter as he went along."

In a deposition of Suetter taken in 1941 in connection with an action brought against him by Rhode, he stated that fourteen or fifteen test holes had been dug on various parts of the mining property but that he had kept no written record of the tests. He conceded that he had employed no engineers to test the property although he indicated that various men who wanted to buy the property had made tests of it. Other testimony revealed that he had bought a gold-washing plant for over $40,000, mainly paid by checks on the Suetter Placer Mines although the machine was installed in a California mine. The plant was sold for $22,500 by Suetter as sole owner, and Suetter admitted that he failed to account to Rhode for the proceeds of the sale.

After the civil action brought by Beckman against Suetter was settled, Suetter continued to solicit money from Rhode. On July 27, 1939, Rhode wrote Suetter the letter on which count six is based, enclosing $2,000 "to apply on the Josephine Mine" and asking for a certificate for three units of the Suetter Placer Mines (one of the units had already been paid for by a check dated May 8th). Suetter acknowledged cashing the $2,000 check but said that the transaction had been agreed upon before his settlement with Beckman. He admitted that he had considered all the several mines mentioned during the trial, the St. John Boscoe and several others, as Suetter Placer Mines but that in July of 1939 he was not operating any and had only the

Josephine Mines left. He stated that he had spent $3,000 of Rhode's money on a California mine.

On August 25, 1939, Suetter wrote Rhode the letter on which count seven is based, revealing that he wanted to renew operations on the Josephine mines, asking for $5,000 to purchase equipment, and concluding that "This will result in quick returns."

 Suetter admitted having sent the letters involved herein but denied the existence of a scheme to defraud. He contends that there is no evidence to support the verdict of guilty on counts six and seven because there was no showing of such a scheme to defraud. "A question of law is thus presented, which calls for an examination of the record, not for the purpose of weighing conflicting testimony, but only to determine whether there was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict." Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 18, 63 L.Ed. 1173. The evidence must be considered in the light most favorable to appellee. Holmes v. United States, 8 Cir., 134 F.2d 125, 130; Hemphill v. United States, 9 Cir., 120 F.2d 115, 117.

The evidence shows that from the time he acquired the Josephine mines in 1934 at least until August, 1939, when he wrote Rhode asking him to buy more trust units, Suetter solicited funds in connection with those mines. He stated repeatedly to prospective investors that he was sole owner and had clear title to the properties when in reality he had given Montag a mortgage on and a half-interest in the claims and had promised Hogan an interest of 5%. He represented that the proceeds from the sale of trust units would be used to buy equipment for the mines. As a matter of fact he had written Montag that a large part of Montag's investment would be returned upon the first payment by Beckman. He spent amounts collected on mining projects other than the Josephine mines. He sold a gold mining machine, bought mainly with Suetter Placer Mines funds, representing that he was sole and exclusive owner; he failed to account for the sale price of the machine. Suetter in the trust agreement promised to keep books and render annual accounts, but he did neither. He told Rhode that experts in mining had been consulted and had agreed that the properties

contained untouched value whereas he had never employed an engineer to report on the property. He made other representations to Rhode concerning the great value of the mines. Rhode testified that he relied on Suetter's statements as to value and ownership of the mines.

As late as July, 1939, after the settlement with Beckman, Rhode sent Suetter an additional $2,000 in the letter set forth in count six. In August of the same year Suetter wrote Rhode the letter, recited in count seven, in which he asked for more money. Both letters bore dates subsequent to Suetter's statement to Beckman that the Josephine mines were no good and unworkable.

█ There is ample testimony herein to support a conclusion that appellant originated statements exaggerating the value of the mines and that he could not reasonably have believed his statements in that regard. The record is clear that he knowingly misrepresented certain facts on which his estimate of value was based and also the true situation concerning his title to the properties. The jury could logically have found a scheme to defraud, and the use of the mails in furtherance thereof as shown by the letters contained in counts six and seven. Consequently, there is substantial evidence to sustain the verdict of guilty on those counts.

█ Appellant questions the admission into evidence of certain exhibits without requiring appellee to elect or designate the charges in the indictment to which the evidence was directed. No such designation was necessary since the exhibits were properly admitted as tending to show a scheme to defraud. In cases of this kind great latitude is allowed in the introduction of evidence. Hartzell v. United States, 8 Cir., 72 F.2d 569, 584; Tenenbaum v. United States, 5 Cir., 11 F.2d 927, 929. Had the evidence admitted been competent as to only one of several counts in the indictment, the defendant's remedy was not to require an election of the count to which the evidence was applicable, but to request that the jury be instructed to limit their consideration of the evidence to the particular count, Schonfeld v. United States, 2 Cir., 277 F. 934, 937; Moffatt v. United States, 8 Cir., 232 F. 522, 534. The cases cited by appellant are in accord with the general rule, Jarvis v. United States, 1 Cir.,

90 F.2d 243, 244, and Coplin v. United States, 9 Cir., 88 F.2d 652, 658.

 It is suggested by appellant that the trial court should have granted the motion to set aside the verdict of guilty on counts six and seven as inconsistent with the jury's conclusion of not guilty on counts one, two and five. It is true that the same scheme to defraud was alleged in each count but each count involved a separate and distinct communication. The jury might have believed that certain letters were written in furtherance of the scheme to defraud while others were not, and thereby might have arrived at different verdicts for the several counts. Therefore, the verdict herein is not inconsistent, Muench v. United States, 8 Cir., 96 F.2d 332, 336. Furthermore, it is settled that a verdict need not be consistent. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Coplin v. United States, 9 Cir., 88 F.2d 652, 661; Macklin v. United States, 9 Cir., 79 F.2d 756, 758.

Affirmed.