## STEIN v. UNITED STATES.

### No. 10694.

Circuit Court of Appeals, Ninth Circuit.

Feb. 18, 1946.

Writ of Certiorari Denied April 29, 1946.

See 66 S.Ct. 980.

Pacht, Pelton, Warne, Ross & Bernhard, Isaac Pacht, Clore Warne, and Louis M. Brown, all of Los Angeles, Cal., for appellant.

Charles H. Carr, U. S. Atty., James E. Harrington, Sp. Asst. to Atty. Gen., William Strong and Alden F. Houck, Sp. Attys., all of Los Angeles, Cal. for appellee.

Before MATHEWS, STEPHENS and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

An amended information (information) containing seventeen counts charged Jacob R. Stein, appellant herein, with the doing of acts in violation of War Production Board (WPB) General Preference Order M-9-a, promulgated pursuant to the Second War Powers Act, Public Law 507, 77th Congress, Chapter 199, 2d Session, 56 Stat. 177, 50 U.S.C.A.Appendix § 633. Counts 4 and 11 were dismissed; the jury found defendant not guilty as to Count 1; he was convicted and sentenced as to the remaining fourteen.

Each count charged that appellant on a certain date, the dates ranging from December 3, 1942, to March 16, 1943, did wilfully and unlawfully deliver a stated quantity of a wire mill product, namely copper wire, to a purchaser; that said delivery was not made to fill an order bearing appropriate allocation classification and purchaser's symbol and bearing a preference rating of AA-5 or higher, or bearing any allocation classification, purchaser's symbol or preference rating whatsoever; that said delivery was not expressly authorized by the Director General for Operations; that appellant thereby wilfully diverted said wire mill product from the war effort of the United States.

Appellant was organizer and sales manager, and was in control, of a company which originally dealt in aluminum and aircraft parts and subsequently handled salvage and other materials.

In September, 1942, appellant purchased certain materials from Lockheed Aircraft Corporation (Lockheed) including a surplus inventory of insulated copper wire. He inventoried the materials and printed a catalogue of them, and in October, 1942, sent a copy of the catalogue to various firms and government agencies including WPB and the Western Procurement District Office of the Army Air Force (AAF). The engineering division of the Western Procurement District Office advised appellant not to sell certain of the materials until written releases were obtained from that office. Appellant made some telephonic requests for permission to make sales and was verbally given such permission. Thereafter he made numerous sales and de-

liveries of the materials. In 1943 his activities were twice investigated by WPB agents, and in October of that year the information herein was filed. The statements contained in this paragraph will be enlarged upon and related to other circumstances and to effective regulations further on in this opinion.

It is agreed by both appellant and appellee that the purchase orders submitted to appellant by buyers for the sale and delivery of copper wire did not bear any allocation classification, purchaser's symbol, or preference rating of AA-5 or higher. The original of the orders filled by appellant are before us as a part of the bill of exceptions. We have examined them and have found that none of them bears any of the indications of authorization mentioned. It is also appropriate at this point to say that both parties to this appeal agree that the sales and deliveries charged in the information were made and that at the trial there was no issue as to the acts done.

Appellant contends first that his conviction rests upon the fact that he has been found to have done certain acts which are not crimes. Such contention covers the conviction under eleven counts (2, 3, 5, 6, 7, 8, 9, 10, 12, 13 and 14), each involving sales made from November 5, 1942, to March 4, 1943, during which period Priorities Regulation No. 10 referred to by § 933.2(c) (2), which required an order to bear "appropriate allocation classification and purchaser's symbol," was not effective, having been revoked from the beginning of the period.

Appellant is charged under § 933.2(c) (2) of General Preference Order M-9-a (7 FR 5980, 8825). Prior to November 5, 1942, the section read:

"(c) Deliveries of brass mill products or wire mill products. ['Wire mill products' is defined in § 933.2(a) (6) (7 FR 5980, 8825) to mean bare or insulated wire or cable for electrical conduction made from copper or copper base alloy.] Except as expressly authorized or directed by the Director: * * *

"(2) No industrial supplier, mill supplier, plumbing supply house or other person engaged in the business of distributing brass mill or wire mill products to industry or trade, shall deliver or cause to be delivered any brass mill product or wire mill product, unless such delivery is made to fill an order *bearing the appropriate al-*

*location classification and purchaser's symbol (pursuant to Priorities Regulation No. 10)* and bearing a preference rating of AA-5 or higher. [For ready understanding we have italicized the part of the section which had been eliminated.]" Priorities Regulation No. 10, § 944.31 (7 FR 4198, 4833, 5640) was revoked November 5, 1942 (7 FR 9028).

The question then is whether appellant's conduct was condemned by § 933.2(c) (2) even though Priorities Regulation No. 10 with its requirement of appropriate allocation classification and purchaser's symbol had been revoked. It is appellant's position that the whole section was impliedly repealed by the revocation of the Priorities Regulation.

The Priorities System was inaugurated by the Office of Production Management and was continued by WPB, which superseded the Office of Production Management. The allocation classification symbol and the purchaser's symbol used in the Priorities System referred to the amounts of controlled materials to be released. A preference rating referred to the order of deliveries from the standpoint of time. In most instances all three requirements were necessary. In special circumstances an allocation classification and purchaser's symbol without more was sufficient. They were not invariably accompanied by a preference rating. They had an existence of their own separate and distinct from a preference rating. Therefore, if the requirement for an allocation classification and purchaser's symbol falls, the requirement for a preference rating remains unaffected. Under § 933.2(c) (2) of General Preference Order M-9-a, then, a delivery remained unlawful, even after the revocation of Priorities Regulation No. 10, unless it was made to fill an order "bearing a preference rating of AA-5 or higher."

We have seen that the orders filled by appellant did not bear any of the three items originally required by § 933.2(c) (2), and, of course, did not bear the requirement of "a preference rating of AA-5 or higher" as was still required after the revocation of Priorities Regulation No. 10. The court instructed the jury as to § 933.2(c) (2) applicable to the case without noticing the change made by the elimination of the regulation. But this could not possibly have been prejudicial to appellant since there remained the requirement that the order must bear a preference rating of AA-5 or higher and

the orders did not bear such requirement. The point made is not well taken. (The oversight mentioned was not called to the attention of the court at any time. Nevertheless, we have noticed it.)

Similarly, appellant contends next as to Counts 15, 16 and 17 that his conviction rests upon the fact that he has made sales after March 4, 1943, and after § 933.2(c) (2) was amended.

On March 4, 1943, § 933.2(c) (2) was amended (8 FR 2751) to read:

"(c) Deliveries of brass mill products or wire mill products. Except as expressly authorized or directed by the Director:
* * *

"(2) No warehouse shall deliver or cause to be delivered from his stocks any brass mill product or wire mill product except as permitted by Controlled Materials Plan Regulation No. 4. ['Warehouse' is defined in § 933.2(a) (7) (8 FR 2751) to mean a 'person engaged in the business of distributing * * * wire mill products to industry or trade.']"

The pertinent portions of the Controlled Materials Plan Regulation No. 4, § 3175.-4(f) (1) (8 FR 2575), are as follows: "(f) Delivery of brass mill or wire mill products from warehouse stocks. (1) A warehouse may fill an authorized controlled material order, or an order bearing a preference rating of AA-5 or higher for brass mill or wire mill products * * *."

No detailed comparison between the two sections need be set out here to show that the information and the judge's charge to the jury upon the law conform to the section before the amendment but not to the section as it stood after the amendment.

■ No objection was made to the court or any mention made in relation to this point prior to the motion in arrest of judgment. However, in view of the fact the regulations are numerous and not simple, we feel that the conviction upon these three counts should be reviewed by us in order that justice may be done. The judge

correctly instructed in regard to law applying to all of the counts excepting these three. As to them no instruction covering the governing law was given and for that reason they must be reversed. Bailey v. United States, 9 Cir., 1926, 13 F.2d 325, 327; Williams v. United States, 10 Cir. 1933, 66 F.2d 868, 869; Corson v. United States, 9 Cir., 1944, 147 F.2d 437, 438.[1]

■ Appellant claims next that he is not of the class of persons governed by the section under which he is charged. He makes the point that, since he made only one purchase of copper wire, he was an occasional dealer and not a distributor. However, he admitted that he had been engaged in the business of distributing numerous materials and parts other than copper wire to industry and trade. After he made the copper wire purchase, he had catalogues prepared itemizing copper wire along with other electrical appliances; they were distributed to several hundred of his customers. Over thirty sales of copper wire were made within the period involved herein and some eighty additional sales followed within six months thereafter. Furthermore, the word "distributing" in § 933.2(c) (2) seems clearly to refer to sales and deliveries rather than to purchases; the acceptance of copper wire from a supplier is controlled by subsection (c) (3). Appellant's reasoning is wrong.

Appellant also insists that his position is governed by § 933.2(b) (1), rather than by § 933.2(c) (2) under which he is charged. Subsection (b) (1) controls the delivery of "copper" by a "dealer". "Dealer" is defined in § 933.2(a) (4) as one who receives physical delivery of copper and sells or holds the same for sale without change in form, and "copper" is defined in § 933.2 (a) (1) as the basic refined metal in the form of plates, bars, ingots, cakes, billets, shot, etc. However, appellant is charged with handling copper wire, a product not within the definition of "copper" but a "wire mill product" within the terms of subsection (c) (2). Therefore, he was engaged in the business of distributing a wire

[1] In Corson v. United States, supra, the court held that the failure to instruct the jury concerning the applicable law was prejudicial error. Therein the jury was never informed, directly or indirectly, in indictment, testimony, instructions, or otherwise as to what constituted guilty conduct. As the court commented, 147 F.2d at page 438, "For all the jury was told about the applicable law, appellant may have been acting fully within his rights in what he did." The point had been seasonably made, but it is quite evident from a reading of the opinion that this circumstance had no part in directing the decision.

mill product within the meaning of that subsection.

The next question raised is whether requirements of General Preference Order M-9-a taken in conjunction with Priorities Regulations Nos. 1 and 13 were sufficiently definite to support a conviction against appellant. He says that certain deliveries charged in the information were permitted by Regulation No. 13 in some circumstances and that those circumstances were vaguely and confusingly described.

■ Priorities Regulation No. 13, § 944.- 34(a), 7 FR 7522, 9453, allows, without any priority, *special* sales of surplus goods by "persons not regularly engaged in the business of selling such materials including * * * sales by persons who, by reason of the effect of priority orders or for other reasons, cannot use such materials in the regular course of their business." Subsection (b) (2) (i) provides that "A sale of any material by any person who regularly in the course of his business sells such material in the same form *is not a special sale.*" One example of what is meant by a "special sale" could well be the original sale herein by the aircraft corporation Lockheed (engaged in the manufacture of airplanes), disposing of its surplus copper wire. Obviously, while material might be surplusage for one purpose, it need not necessarily be surplusage for another. The circumstances of the original sale are not material here. Regulation No. 13 can not logically be interpreted to apply to the deliveries made by appellant in the instant case. He was not a person "not regularly engaged in the business of selling such materials" and therefore one permitted to make special sales without a priority. He was regularly engaged in the business of handling a great variety of aircraft materials and parts, and as a part of which business he bought copper wire and sold it as the trade came. His position is not altered by the fact that in a single purchase he bought a quantity of material not theretofore handled by him.

■ Priorities Regulation No. 13, § 944.- 34(c) (2) (iii), 7 FR 7523, exempts from priorities individual lots of war material of an aggregate price of less than $100, but immediately following is an express prohibition against dividing a single lot of a value exceeding $100 into smaller lots of lesser value. Appellant purchased a single lot of wire priced at over $4,000, which

he sold in smaller lots. He therefore does not fall within the less-than-$100 provision. Appellant is not within the exemptions of Regulation 13.

■ It is further argued by appellant that Priorities Regulation No. 1, § 944.1(a), 6 FR 6681, made compulsory certain of the deliveries charged in the information. Regulation No. 1 had a general application over a variety of commodities whereas the General Preference Orders set restrictions on specific commodities. General Preference Order M-9-a deals with copper and copper products and would be controlling herein. Under the express provision of Priorities Regulation No. 1: "When any rule, regulation or Order of the Director of Priorities prohibits or restricts deliveries or use of any Material, such prohibition or restriction shall, in the absence of a contrary direction, apply to all deliveries and use made after the effective date of the rule, regulation or Order, including deliveries under contracts or purchase orders accepted either prior to or subsequent to such effective date * * *." The regulation and General Preference Order permit of no uncertainty with respect to appellant's deliveries of copper wire.

Appellant next takes the position that the record without conflict shows that there did not exist under the facts the wilfulness on his part necessary to support a conviction.

The Second War Powers Act, Title III, § 301, amending § 2(a) (5) of Act June 28, 1940, 50 U.S.C.A.Appendix § 1152(a) (5), 50 U.S.C.A.Appendix § 633, defines offenses under the Act in the following terms: "Any person who willfully performs any act * * * required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both." A violation of WPB preference Order M-9-a falls squarely within the quoted language. The definition fixes two requirements, the performance of a prohibited act and the performance of it wilfully.

■ Appellants' principal defense in the trial below was a purported authorization of representatives of the Western Procurement District Office of the Army Air Forces for the sale or disposal of materials.

The trial court took the view, correctly, that the acts or conversations of said representatives could not relieve the appellant of his duty to obey any rule, regulation or order issued by the WPB but were to be considered as bearing on the issue of wilfulness.[2]

The case of United States v. Murdock, 1933, 290 U.S. 389, 394-396, 54 S.Ct. 223, 78 L.Ed. 381, holds in effect that wilfulness, when made a necessary element of a crime arising by failure to obey an administrative officer or directive, means an act done without justifiable excuse or in stubborn or obstinate disregard of the plain meaning of such order. The case of United States v. Slobodkin, D.C.D.Mass.1943, 48 F.Supp. 913, 916, involved a violation of regulations of the Office of Price Administration. The word "wilfulness" is therein defined as meaning "either a conscious violation or deliberate unwillingness to discover and obey the law.[3]

■ Appellant claims that there is not substantial evidence to support the verdict in the light of the above definitions.

There is sufficient evidence to support the following facts:

When appellant originally purchased the inventory of materials, including the copper wire, from Lockheed in the latter part of September, 1942, he requested that the following sentence be inserted in the purchase order: "It is also understood that we, as buyers, will not under any consideration release any of this material to anyone not in a position to furnish proper priorities or conformation with all rules and regulations as prescribed by the War Production Board." Lockheed had entertained some doubt as to whether WPB or AAF jurisdiction controlled the situation, but considered itself sufficiently protected by the insertion.

Catalogues of the purchased inventory were prepared and distributed by appellant to various firms and government agencies. Letters accompanied the catalogues which recited: "Priority regulations must be complied with in full. We reserve the right to submit all orders to the War Production Board for approval before shipping."

In the latter part of October, 1942, an agent of the Western Procurement District Office of the AAF, Thomas F. Tooker, engaged in locating strategic and critical materials needed for aircraft, called on appellant when attracted by a large quantity of steel being transported into appellant's warehouse. The agent inspected appellant's warehouse and thereupon informed him that the AAF controlled certain materials, such as aluminum bar and certain aircraft instruments, and that clearance for sales of those items would have to be obtained from the AAF. Appellant received confirmation of Tooker's position in a letter dated November 16, 1942, from Major Walter F. Zwick of the Western Procurement District Office, stating in part that appellant's company was "required to obtain release from this office in writing for sale of all strategic materials, which purchases from vendee are assigned priorities lower than AA-1 * * *. The term 'strategic materials' is to be construed as those materials listed in the Airplane Designers Handbook as 'critical.' * * * Release may be obtained by calling or writing this office stating name and address of buyer, article, name and part number (if assigned by manufacturer), and priority assigned to vendee's purchase order."

---

2 The record indicates that the AAF does not have or assume to have any authority or jurisdiction to release any one from the force and effect of WPB regulations. The primary function of the Western Procurement District of the AAF in the area is to aid aircraft manufacturers in increasing the production of all aircraft parts being manufactured by subcontractors, to expedite the transfer of these parts into the hands of prime contractors, etc. The jurisdictions of the WPB and the AAF were not overlapping, but complementary. A purchaser could not buy without having a priority; additionally a vendor could not sell if prohibited by the AAF from disposing of any items.

3 Browder v. United States, 1941, 312 U.S. 335, 61 S.Ct. 599, 85 L.Ed. 862; Schmeller v. United States, 6 Cir., 1944, 143 F.2d 544, 553; Binkley Mining Co. v. Wheeler, 8 Cir., 1943, 133 F.2d 863; American Surety Co. v. Sullivan, 2 Cir., 1925, 7 F.2d 605, 606; Townsend v. United States, 1938, 68 App.D.C. 223, 95 F. 2d 352, 357; United States v. Betteridge, D.C.Ohio 1942, 43 F.Supp. 53, 56; United States v. Saglietto, D.C.Va.1941, 41 F. Supp. 21, 28; DiMelia v. Bowles, D.C.D. Mass.1944, 57 F.Supp. 710, 713; People on Complaint of Weber v. Keane, 1944, 181 Misc. 592, 47 N.Y.S.2d 347.

Fred Chapman, civilian employee of the Western Procurement District, testified that on several occasions appellant called him for permission to dispose of various materials and that he informed appellant that the AAF had no jurisdiction over copper wire.

Meanwhile appellant was negotiating with reference to the purchase of a surplus inventory of steel from Lockheed (a separate transaction). He called on Major Edward H. Vockrodt, chief of the redistribution and salvage section of the Western Procurement District Office of the AAF, who informed appellant that the AAF had control of the steel surplus allocated to aircraft industries.

On November 27, 1942, with reference to the steel transaction, appellant visited the Redistribution Division Office of the WPB. Daniel L. Sullivan, district manager of that office, testified that he asked appellant whether necessary authorization forms to deal in allocated materials under war production orders had been filed; that appellant said that that had been done but that the forms had been denied; that he advised appellant that he was entitled to appeal from that denial, which appellant said he would do; that he asked appellant to refrain from engaging in these transactions until he heard from his appeal; that at the time they were discussing all types of controlled materials that were known then as allocated materials, and copper was in the controlled materials, including steel and aluminum. There is corroborating testimony to the effect that copper was specifically mentioned.

In December, 1942, appellant still desiring to purchase steel called on Bruce Daniels, a WPB materials redistribution analyst, who informed appellant that the AAF had control over surplus inventories in the hands of aircraft producers.

An additional call in January, 1943, by appellant on Sullivan of the WPB reveals that appellant's appeal had been denied and that he was again informed to not deal in allocated materials.

In March, 1943, appellant caused a series of sales letters to be sent to prospective purchasers, advising in effect that no priorities were required from the purchaser of the copper wire as the sales had been cleared through the AAF.

On March 17, 1943, a WPB investigator visited appellant's plant and examined appellant's books and records. Still, in May, 1943, appellant caused another letter to be sent to the trade, advising that he had no blanket clearance from the AAF but could clear individual sales.

At all times the copper wire was disposed of openly with no attempt at secrecy and complete records open to government officials were kept of all sales.

We are of the opinion that there was substantial evidence to support the verdict which in this case required the conclusion of the jury that the unlawful acts had been performed wilfully. Briefly, we regard the evidence as to appellant's activities in the following light:

The quoted sentence included in the original purchase order from Lockheed could indicate appellant's willingness at the time to comply with WPB regulations. More likely the insertion was required by Lockheed, the seller, as a protection against any possible accusation that it was circumventing the law. The insertion may have some importance in that it demonstrates that appellant knew of Lockheed's impression that WPB was the controlling agency. It would appear that appellant entertained no doubt as to the identity of the controlling jurisdiction at the time he distributed his catalogues of material for sale, yet within a few weeks he accepted the statements of Tooker and Major Zwick of the AAF as to that agencies' jurisdiction, without inquiry, and despite his knowledge and experience derived from the original Lockheed transaction and from the additional instances pointed out above as well as from the very nature of his own business of handling a great variety of strategic materials. (There were other significant contacts and conversations with agents of Lockheed, the AAF and the WPB set forth in detail in the record not mentioned here.) Even Major Zwick's letter of confirmation called for WPB priority ratings of appellant's prospective purchasers.

Neither Tooker, nor Major Zwick's letter, referred to copper wire specifically, but appellant chose to presume that it was included and to contact the AAF with regard to its disposal. (We note here that the copper wire occupied not a small part of the original inventory purchased but a substantial one.) In addition, appellant made no effort to seek authorization as to each separate delivery of copper wire here-

in, but relied on a few scattered telephonic conversations with the AAF as blanket authority to do so. In the end, appellant saw fit to manifest his reliance on AAF control by the March and May, 1943, letters, after he had been told by Chapman of that agency that it had no jurisdiction over the copper wire.

As to the steel enterprise, appellant's various contacts with the WPB could evidence a willingness to conform to existing regulations. However, it is apparent to us that appellant went from office to office, that is, from the AAF to the WPB. This, even though the AAF had informed him that it had control of the steel surplus allocated to aircraft industries, as did one WPB agent Daniels. The true reason, it would seem, which prompted the numerous calls was that permission of neither the AAF nor the WPB to purchase the surplus inventory was forthcoming.

There is no compelling inference from the testimony regarding the purported authority of the AAF that appellant did not willingly violate the law. We cannot say that the evidence negatives the suggestion that appellant was seeking plausible excuses for making the sales in the absence of legal authority to make them. United States v. Murdock, supra; United States v. Slobodkin, supra. See also the cases cited in footnote 2 hereof.

■ Appellant raises the point that the court erred in ruling on the rejection and admission of evidence to his prejudice the testimony of Sullivan to the effect that he requested appellant to refrain from dealing in all types of controlled materials, meaning steel, aluminum and copper. We are of the opinion, however, that the evidence admitted was material on the issues of wilfulness.

■ Appellant also raises the point that the verdict of acquittal upon the first count of the amended information herein in effect makes a finding by the jury of "unproved" as to the other counts upon which it purported to return a verdict

of guilty, so as to render the verdict or the jury fatally inconsistent and insufficient to support the judgment. It is stated in the majority opinion in the case of Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 80 A.L.R. 161:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. [Citing cases.] If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold * * *." Borum v. United States, 1932, 284 U.S. 596, 52 S. Ct. 205, 76 L.Ed. 513; United States v. Dotterweich, 1943, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48. We perceive no inconsistency in the verdicts, but even if there were, this court has uniformly ruled that inconsistency as to verdicts in plurality of counts in one indictment or information is not fatal.[4]

We have reviewed all of the claims of error premised upon the court's rulings as to testimony and hold that there is no reversible error shown.

There are in this case fourteen separate judgments and commitments or one of each to each count upon which conviction was had. All fourteen judgments and commitments are combined in one document. For each conviction the punishment pronounced is imprisonment for one year to run concurrently. A fine is also assessed in the sum of $25,000 provisioned that it is "to be distributed equally between all of said counts on which the defendant [appellant] was convicted." In other words a fine of $1,785.71 was assessed on each count. We affirm the judgments and the commitments as to Counts 2, 3, 5, 6, 7, 8, 9, 10, 12, 13 and 14, and we reverse the judgments covering Counts 15, 16 and 17.

Affirmed and reversed.

[4] Morrissey v. United States, 9 Cir., 1933, 67 F.2d 267; Macklin v. United States, 9 Cir., 1935, 79 F.2d 756, 758; Maugeri v. United States, 9 Cir., 1935, 80 F.2d 199, 201; Coplin v. United States, 9 Cir., 1937, 88 F.2d 652, 661; Long v. United States, 9 Cir., 1937, 90 F.2d 482;

Kamanosuke Yuge v. United States, 9 Cir., 1942, 127 F.2d 683, 689; Suetter v. United States, 9 Cir., 1944, 140 F.2d 103; Audett v. Johnston, 9 Cir., 1944, 142 F.2d 739, 740; McElheny v. United States, 9 Cir., 1944, 146 F.2d 932.