**BRIDGMAN et al. v. UNITED STATES.**
No. 12028.

United States Court of Appeals
Ninth Circuit.
June 28, 1950.

Pat A. McCormick and Patrick H. Ford, Los Angeles, Cal., for appellant Bridgman.

Robert E. Krause, Long Beach, Cal., for appellant Henson.

Ernest A. Tolin, U. S. Atty., Norman Neukom and Bernard B. Laven, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before STEPHENS, and POPE, Circuit Judges, and LING, District Judge.

STEPHENS, Circuit Judge.

Ernest H. Bridgman and Jay C. Henson are here appealing from a conviction by court and jury upon an indictment charging them and twenty-five others with mail fraud, 18 U.S.C. (1946 ed.) § 338, and specifying eighteen overt acts each in separate counts. The indictment was dismissed as to eighteen of the defendants. The remaining nine were brought to trial. At the conclusion of the government's case, the district court granted defendants' motions for judgment of acquittal as to all counts, with the exception of Counts Three, Four, Seven, Fourteen and Seventeen, on the ground that no evidence had been submitted as to the overt acts set out in paragraph 2 of each count. At the conclusion of a lengthy trial, motions for judgments of acquittal as to the above enumerated five counts were again interposed on behalf of all remaining defendants and all such motions were denied. After submission and extended deliberation, the jury returned a verdict of not guilty on all such counts as to four defendants, was unable to reach a verdict as to three defendants [as to whom a mistrial was declared], and found appellant Bridgman guilty on Count Four and appellant Henson guilty on Count Seven, at the same time returning a verdict of not guilty as to each appellant on each of the four other counts. After denying renewed motions for acquittal and motions for new trial as to Bridgman and Henson, the district court pronounced sentence upon each.

The statute under which appellants were convicted, insofar as pertinent here, is as follows: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement whether addressed to any person residing within or outside the United States, in any post office, or station thereof, or street or other letter box of the United States, or authorized depository for mail matter, to be sent or delivered by the post office establishment of the United States, or shall take or receive any such therefrom, whether mailed within or without the United States, or shall knowingly cause to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such letter, postal card, package, writing, circular, pamphlet, or advertisement, shall be fined not more than $1,000, or imprisoned not more than

five years, or both." 18 U.S.C. § 338, now § 1341 of the new Title 18 U.S.C.A.

It is alleged in paragraph 1 of Count One of the indictment that during a certain period the defendants therein named "devised and intended to devise a scheme and artifice to defraud purchasers and prospective purchasers of certain vending machines, and persons looking for employment profits and returns in connection with the operation of vending machines, which said persons, the defendants, under their own names and under * * * [certain] fictitious trade names * * *, would induce to purchase certain nut vending machines known as Star One Cent Vendor and Sun Five Cent Vendor, and to obtain money and property by means of * * * [certain] false and fraudulent pretenses, representations and promises [therein set out], well knowing at the time that the pretenses, representations and promises would be false when made: * * *." This paragraph is incorporated by reference as paragraph 1 of each of the succeeding seventeen counts. It is alleged in paragraph 2 of each count that the defendants, for the purpose of executing and attempting to execute the "scheme and artifice" stated in the first paragraph caused to be placed in the mail a letter identified therein. A different letter is described in each count.

The nut vending machines the sale or attempted sale of which is part of the charge against appellants were manufactured by an individual concern owned by defendant Earl H. Rhodes and operated under the fictitious trade name "Los Angeles Manufacturers." Rhodes advertised for so-called "distributors" to sell the machines and engaged such persons under what was called a distributor's contract. Such contract permitted the distributor to sell the vending machines manufactured by Los Angeles Manufacturers and fixed a price [usually about 50% of the retail price] at which the distributor "purchased" the machines. The difference between such fixed price and the price at which the machines were sold to the customer-operator went to the distributor. The distributors, with a few exceptions, were required to collect 50% of the purchase price from the customer at the time of order, by check or money order payable to Los Angeles Manufacturers. The balance of such purchase price was collected by the latter upon delivery of the machines. The distributors received the difference between the selling price and the price fixed in their contracts by check of Los Angeles Manufacturers, only after the selling price had been finally and fully collected. Rhodes carried no social security or withholding taxes on any distributor, and all traveling expenses were borne by the individual distributor. Many of the distributors employed their own sales personnel.

Los Angeles Manufacturers sold only to authorized distributors. As each new distributor came into the organization, he received a "sales kit" of advertising literature, profit schedules, brochures, etc. all of which was prepared and furnished by Earl H. Rhodes. All new matter had to be submitted to Rhodes for approval before use. Each distributor was issued a letter of identification signed by Rhodes. The sales literature mentioned above contained the representations alleged in the indictment to have been falsly and fraudulently made.

The distributors, under Rhodes' prepared instructions, first would place advertisements [samples were part of the sales kit] in newspapers relative to the availability of nut vending machine routes. Direct contact was established with any person who inquired as to such routes. Orders procured were sent to Los Angeles Manufacturers, and Rhodes would acknowledge receipt by mail. When shipment was made by Los Angeles Manufacturers, a sight bill of lading would be sent through the mails. Appellants were distributors as were all the others indicted with the exception of defendant Rhodes. Neither had any actual experience to support his representations to prospective operators.

Appellant Henson met defendant Rhodes through the medium of a newspaper advertisement as to investment possibilities. After talking to Rhodes at least twice and checking Rhodes' credit rating, Henson accepted "employment" as a distributor. Appellant Bridgman rented space from Los Angeles Manufacturers on its premises pay-

ing a monthly rental by check, kept separate books, employed his own help, and operated as an individual concern called the "Bridgman Distributing Company." Neither appellant knew the other prior to their indictment.

As mentioned above, a mistrial was declared as to three of the nine defendants brought to trial. Among the three, as to whom the jury could not reach a verdict, was defendant Earl H. Rhodes.

Appellants contend on this appeal that the verdicts were inconsistent; that their rights were prejudiced by mass trial; that the district court erred in making a blanket order at the conclusion of the government's case admitting as against the other defendants all the evidence theretofore offered and admitted against particular defendants; that the evidence was insufficient to show a "scheme or artifice" as those terms are used in 18 U.S.C. § 338; and that the district court erred in failing to instruct as to a defendant's right to cross-examine witnesses called by co-defendants and in improperly limiting the extent of appellant's right of cross-examination.

### As To Inconsistent Verdicts

■ Appellants insist that the jury verdicts were inconsistent. The indictment charged the nine defendants brought to trial with devising and intending to devise a "scheme or artifice" to defraud a certain class of persons and causing the use of the mails in furtherance thereof in violation of the federal statute set out above. Four were acquitted by the jury. A deadlock occurred as to three. And the remaining two were found guilty.

We do not believe that the verdicts were necessarily inconsistent. Although the jury may have believed beyond a reasonable doubt that defendants were participants in a comprehensive plan to dispose of vending machines, the jury may not have been convinced that some of the defendants knowingly participated in the alleged scheme to defraud or that they caused the use of the mails in furtherance of the scheme. Compare Suetter v. United States, 9 Cir., 1944, 140 F.2d 103. Much of appellants' argument concerns the failure of

the jury to reach a verdict as to Rhodes. But no verdict at all was arrived at as to Rhodes.

■ Even if we assume that the verdicts were inconsistent, it is well settled that such inconsistence is not fatal to and does not invalidate verdicts of guilty. See Dunn v. United States, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; and among many decisions of this court: Macklin v. United States, 9 Cir., 1935, 79 F.2d 756; Suetter v. United States, supra; McElheny v. United States, 9 Cir., 1944, 146 F.2d 932; Stein v. United States, 9 Cir., 1946, 153 F.2d 737; Robinson v. United States, 9 Cir., 1949, 175 F.2d 4; Catrino v. United States, 9 Cir., 1949, 176 F.2d 884. Appellants in this regard cite federal cases pre-dating Dunn v. United States, supra, and various state cases, but even without the Dunn decision they would not act to set aside our long standing and practical rule of decision.

■ Moreover, acquittal of appellant's co-defendants "is a false quantity in the consideration of" the sufficiency of the evidence to support the verdicts, a matter hereinafter discussed. See Morrissey v. United States, 9 Cir., 1933, 67 F.2d 267, 273.

### As To Mass Trial

■ Appellant's main position is that they were confounded in making their defenses by being tried *en masse,* as were the accused-petitioners in Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 1249, 90 L.Ed. 1557. In that case, a single conspiracy was charged, and the trial judge instructed the jury that the "indictment charges but one conspiracy, and to convict each of the defendants of a conspiracy, the Government would have to prove, and you would have to find, that each of the defendant's was a member of that conspiracy. You cannot divide it up * * *, and the question is whether or not each of the defendants or which of the defendants, are members of that conspiracy." The Circuit Court of Appeals determined that such instruction was in error because of a variance in the proof for the charge, i. e., because the proof showed several conspiracies rath-

er than one, but affirmed the convictions on the ground that in the circumstances the error was harmless under the ruling in Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. See United States v. Lekacos, 2 Cir., 1945, 151 F.2d 170. When the case reached the Supreme Court, the government conceded the variance. The admitted error was deemed by the Supreme Court to have pervaded the whole case adversely affecting the rights of the petitioners, and reversal was ordered, the Supreme Court having this to say: "The dangers of transferance of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place. * * * [Petitioners' substantial rights were prejudiced by their being] tried *en masse* for the conglomeration of distinct and separate offenses committed by others * * *." Kotteakos v. United States, supra, 328 U.S. at pages 774, 775, 66 S.Ct. at pages 1252, 1253, 90 L.Ed. 1557.

The indictment here likewise alleges but a single, all-inclusive scheme, each count of the indictment, however, specifying a different and distinct overt act in furtherance of such scheme. The trial court's instructions were based upon the assumption that upon the evidence there could be a single scheme. Appellants contend that the evidence shows several distinct schemes [perhaps as many as there are defendants, other than Rhodes[1]], if anything, rather than one all-inclusive scheme. Using the Supreme Court's metaphor, they are saying that the various defendants were separate spokes meeting in a common center (Rhodes) but without the rim of the wheel to enclose the spokes. The government does not concede the variance. Thus, we have before us an issue not presented nor determined in the Kotteakos case but which this court since that decision has had occasion to consider. See Canella v. United States, 9 Cir., 1946, 157 F.2d 470; Blumen-

thal v. United States, 9 Cir., 1946, 158 F.2d 883, affirmed, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

In Blumenthal v. United States, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154, the Supreme Court was placed in the same position and was obliged to determine that which was admitted in the Kotteakos case. The indictment of Blumenthal and others charged a single conspiracy in a single count. Ten overt acts were specified. [We consider it not a material point of difference that the indictment in the instant case charged the same scheme in eighteen counts each count specifying a different overt act]. The government there alleged and sought to [and did] establish that all of the defendants-petitioners and other unidentified persons conspired together to dispose of a certain stock of whiskey at prices in excess of the wholesale ceiling. Their convictions were upheld. The Supreme Court distinguished the facts before it from those upon which its prior decision was based, as follows: "Apart from the much larger number of agreements there involved [in the Kotteakos case], no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. * * * There was no drawing of all together in a single, over-all, comprehensive plan. Here the contrary is true. All knew of and joined in the overriding scheme. * * * All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. * * * We think therefore that in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps * * *." Blumenthal v. United

---

1. Several witnesses testified to the fact that during part of the period covered by the indictment, defendants Carner, Johnson, Alexander, and Sippel were employed by appellant Bridgman as sales-men for the Bridgman Distributing Co. At the other times, they as were all the defendants except Rhodes were under contract with Los Angeles Manufacturers as distributors.

States, supra, 332 U.S. at pages 558, 559, 68 S.Ct. at page 257, 92 L.Ed. 154.

At this point in our reasoning it is helpful to note that we are only concerned now with whether there was a "plan", an all-inclusive plan rather than separate ones linked together by the participation in each of a central figure. A "plan" is of course necessary to a "scheme", but whether the single "plan" here, if there were such, reached the proportions of a "scheme" depends upon other considerations. We limit our present inquiry to whether the district court was wrong in supposing that on the evidence a single, over-all plan could be found.

We find numerous distinctions in the facts of this case from those of the cases relied upon by appellants. See Kotteakos v. United States, supra; United States v. Corlin, D.C.S.D.Cal.1942, 44 F.Supp. 940. Each defendant-distributor here knew he was a part of a larger plan to dispose of the products of the Los Angeles Manufacturers. He knew in general that distributors worked under similar contracts and were supplied with like sales literature and kits prepared by Rhodes or Los Angeles Manufacturers and that representations of the same character would follow from utilization of such instructions. As the Supreme Court stated it, Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154, "The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." We think the record here recites the facts of a single comprehensive plan, and hence the district court did not err in supposing from the evidence that there could be one over-all plan.

## As To Admission Of Evidence

■ Early in the course of the proceedings in the trial court during the presentation of the government's case-in-chief, the court announced that all evidence would be received initially only against the particular defendant or defendants to whom it referred subject, however, to a reserved right in the government to move later for its admission as against all or some of the other defendants at a time when the government considered that sufficient evidence had been introduced to connect such other defendants with the alleged scheme. Appellants claim that this procedure, and its subsequent culmination as hereafter narrated, placed counsel in such a dilemma as to cross-examination as to cause it to be "a substantial and prejudicial deprivation of the right of confrontation of witness, as contained in the Bill of Rights, Sixth Amendment, United State Constitution." Such mode of proceeding received at least implied approval by the Supreme Court in Blumenthal v. United States, supra. We do not believe that any such measure taken in the interests of fairness to the defendants and of judicial administration can be said to violate any constitutional safeguard. We perceive a much greater danger, than that inhering here as presently discussed, in the procedure suggested by appellants of offering the evidence as to all or most of the defendants subject to a motion to strike if it is not later connected up. The evidence in question was initially and properly admitted as against the individual defendant or defendants to whom it related subject to the government's right of motion.

■ At the close of its case, the government moved that the testimony theretofore introduced in relation to individual defendants be admitted against each and all of the other defendants individually and collectively with the exception of the testimony of witness Van Meter with reference to his conversations with four of the defendants [one of whom was appellant Bridgman]. The district court granted the motion. The court thereafter, as soon as the jury was called, instructed them as to the above action by the court and such action's effect

on their consideration of the case, as set out in the margin.[2] At the conclusion of the trial before submission of the case to them, the jury were finally charged in part as follows: "The guilt or innocence of each defendant must be separately determined by the jury. Each defendant has the same right to that consideration on your part as if he were being tried alone. * * * Evidence admitted for a special or limited purpose or for or against a particular defendant or defendants, as indicated by the court at the time such evidence was offered, must be considered by you only for such special or limited purpose or as affecting particular defendants, as the court determined by the ruling during the trial."

Witness Van Meter testified that he was a United States Post Office inspector and was assigned to investigate this matter. He related conversations had individually with defendants Alexander and Carner in his office, a conversation with defendant Rhodes and appellant Bridgman together in Bridgman's office, and some telephone conversations thereafter with Rhodes. The substance of this evidence, if anything, constituted admissions of the individual defendants concerned.

As pointed out by the Supreme Court in the Blumenthal case, supra, 332 U.S. at page 559, 68 S.Ct. at page 257, 92 L.Ed. 154, "the grave danger * * * arose not from the trial court's rulings upon admissibility or from its instructions to the jury * * * [but] rested rather in the risk that the jury, in disregard of the court's direction, would transfer, consciously or unconsciously, the effect of the excluded admissions * * * across the barrier of the exclusion to the other * * * defendants." We believe the trial court's instructions in this case were sufficiently adequate to reduce such risk to the minimum although the trial court could have gone further, as the trial court did in the Blumenthal case, and made specific reference to its instructions to the jury during the trial at the time of ruling on the government's motion.

Appellants are of the opinion that the "learned trial judge committed prejudicial misconduct in granting the prosecution motion and so informing the jury. [see footnote 2 ante] * * * and leading the jury to believe that a conspiracy had been legally proved, binding each appellant for the acts of his co-defendants. *The impact of such a sweeping order could not fail to impress the minds of non-lawyers,* particularly where the trial court was obviously misled as to the legal principles at stake." We do not accede to this argument. The trial court necessarily had to rule preliminarily on the admissibility of such evidence and properly by its final instructions left the matter of whether or not there was in fact such a conspiracy or whether or not each defendant participated therein to the jury.

### As To Sufficiency Of The Evidence

▉ Appellants contend "That there was no substantial evidence to establish a 'scheme' in which appellants jointly participated, within the meaning of 18 U.S.C. A. § 338." Part of their argument goes to the weight and credibility of the evidence introduced, matters which are solely within the province of the jury and as to which a reviewing tribunal has no right to inquire.

2. "During the course of the trial, it was announced that certain of the evidence would be received initially only in relation to the particular defendant or defendants to whom the evidence appeared expressly related, the government reserving the right to move that all of the evidence be admitted in relation to other or all of the defendants. At the conclusion of the case, the government made such a motion and, except as I * * * shall state, you are to consider that all of the evidence, admitted evidence, offered by the government * * * has been received in relation to all of the defendants.

"You are to consider that all of the admitted evidence offered by the government * * * has been received in relation to all of the defendants, excepting * * * that the testimony of the witness Van Meter as to his conversation with defendants Bridgman, Carner, Rhodes, and Alexander is to be considered by you only with relation to the individual defendants with whom he testified he spoke. In other words, his testimony concerning his conversation with Bridgman, only with relation to the defendant Bridgman, and so on as to the other defendants."

Stripped of such misconceived points, the contention requires this court to exercise its true function, namely, to determine if there is in the record any substantial evidence to support the verdict. Such issue was properly preserved by appellants. It must be noted, however, that the specification of error limits such inquiry to whether there is such support as to one phase only of the offense charged. That is, whether there was enough to go to the jury on the question of the existence of a scheme or artifice to defraud and the wilful participation therein by each defendant. And, as we have heretofore remarked, the acquittal of appellants' co-defendants is a "false quantity" in such inquiry.

A complete reading of the record convinces us that appellants' position cannot be sustained. The most which may be said of the evidence is that it was in conflict, and it is the function of the triers of fact to resolve such conflict unfettered by what might have been determined by others in the circumstances.

Much is made by way of argument of appellant Henson's good faith going to his intention to participate in the fraudulent scheme charged. We find the court's instructions to the jury adequate to point up the possibility of good faith on the part of each defendant as a defense.[3] To repeat, we cannot disturb the findings in the circumstances.

### As To Cross-Examination

The final two specifications of error may be discussed together. First, appellants argue that the district court erred in *refusing* to instruct the jury that counsel for appellant Bridgman had a right to cross-examine a witness called by co-defendant Rhodes. Secondly, it is contended that prejudicial error occurred in the district court's limitation of appellants' right of cross-examination.

As to the first, appellants take the position that "The Court, in fairness to defendants, should have made it clear that the co-defendants were not bound by the testimony of any witness called on behalf of any individual defendant, and that a right to cross-examine existed * * * that a co-defendant may question the witness, as of right, without being bound by the testimony in the sense that such testimony binds the defendant who calls the witness. Refusal of the Court to so inform the jury is error and misconduct." They liken the situation to where it is essential for the trial court to instruct the jury as to the limited effect of evidence admitted for the purpose of impeachment. Counsel invite our attention to the following colloquy, which is asserted as the basis for the specification of error:

"The Court: * * * There was considerable examination by your associate counsel with respect to Reiner in the direct examination.

"Mr. McCormick: I am not attempting to be lengthy, your Honor. On the other hand, I trust that the court will appreciate the fact that while they may not be adverse, my interests and Mr. Acret's are entirely different matters. That is the only reason I am cross-examining at this time.

"The Court: You may proceed.

"Mr. McCormick: In all fairness, I would appreciate it if the court would explain to the jury that the mere fact that a witness is called by one defendant, it is not to be assumed by them that the other defendants are to be bound by that testimony.

"The Court: The jury will be properly instructed at the proper time.

"Mr. McCormick: I said that, your Honor, in the light of the court's remarks.

"The Court: Yes. You may proceed."

3. The jury was in part instructed as follows. "If a defendant acts in good faith in the honest belief that what he says is true, such honest belief condones a misstatement, and such defendant is excused; however, ignorance of the facts is no excuse for making false statements where a defendant, by the exercise of due diligence, could have become aware of his mistakes, especially where others may suffer a loss by such misstatements."

758

Neither appellant requested instructions on the point raised nor questioned the omission of an instruction to such effect from those given. See Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. However, we have examined the record and the instructions and hold that appellants were fully protected in this respect.

By their last specification of error, appellants contend that the trial court "arbitrarily refused to allow" certain questions on the cross-examination of a government witness and that by such limitation of their right of cross-examination prejudicial error was committed. We have referred to those portions of the record called to our attention by counsel and find there disclosed that the sole ground upon which the objections to such question were sustained was that the questions constituted improper cross-examination because they concerned defensive matters not raised on direct examination. We find no error nor do appellants really argue such ruling to be erroneous under the federal rule. The cases they cite concern other matters, inquiry as to which may be proper on cross-examination. Moreover, appellants were not precluded from introducing by way of defense proof on the matter to which the questions related.

Affirmed.